## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | CHAPTER 7 |
| | : | |
| MUMA Services Inc. et al., | : | Case No. 01-926 (MFW) Through |
| | : | Case No. 01-932 (MFW) And |
| | : | 01-935 (MFW) Through 01-950 (MFW) |
| | : | |
| | : | |
| Debtors. | : | |

### TRUSTEE'S POST-HEARING MEMORANDUM IN OPPOSITION TO NOTICES OF CERTAIN MARITIME LIEN AND OTHER CLAIMS ON THE PROCEEDS OF SALE OF NPR ASSETS

I.    **INTRODUCTION**

The Chapter 7 Trustee, Charles Stanziale, by his attorneys, The Bayard Firm, and Special Admiralty counsel, Watson, Farley & Williams, submits this Post-Hearing Memorandum in Opposition to Claims that have been made in the within proceedings.

On April 26, 2002, this Court approved an Order Authorizing the Sale of the NPR Assets Free and Clear of All Liens, Claims and Encumbrances (the "April 26 Order"). (Trustee's Exhibit A). As part of the April 26 Order, this Court approved an Asset Purchase Agreement dated as of April 1, 2002, as subsequently amended (the "Asset Purchase Agreement") between NPR, Inc., San Juan International Terminals, Inc., Holt Hauling & Warehousing Systems, Inc., and Holt Cargo Systems, Inc., (collectively, the "Sellers"), and Sea Star Line, LLC, (the "Purchaser"), pursuant to which the Sellers sold accounts receivable, vessels, port leasehold and other miscellaneous property (the "NPR Assets") to the Purchaser.

Pursuant to the April 26 Order, the proceeds from the sale of the NPR Assets are being held in a segregated account until the Court determines the proper allocation. This Court subsequently scheduled the hearing to present evidence concerning the allocation for May 13, 2003. Since the sale of the NPR Assets, various claimants submitted maritime lien claims with respect to the NPR Assets, and appeared at the hearing. Additionally, CSX has asserted a non-maritime claim for a constructive trust. A list of claimants, and the status of their claims, is attached as Schedule A hereto.

This Memorandum addresses and opposes the maritime lien claims of the Marine Engineers Beneficial Association ("MEBA") and the American Radio Association ("ARA") (jointly MEBA and ARA are referred to as the "Unions") in the amount of $13,603,073 for dismissal charges[*] alleged to be "seamen's wages."

The Trustee also opposes CSX's non-maritime intermodal constructive trust claim as merely being the claim of a general, unsecured creditor, with no entitlement to a lien or constructive trust.

The personal injury claims in the proceeding are either the subject of stipulations to lift the automatic stay, or subject to separate motions, to which the Trustee has responded in opposition (i.e., Dixon Docket Nrs. 3463 and 3476; Bilbow Docket Nrs. 3450 and 3475).

The Trustee has admitted the validity and enforceability of the ship mortgages as filed.

---

[*] The Unions concede that the remaining claims in their Pre-Hearing Claim, which are for alleged liens for necessaries supplied to a vessel, are not recoverable as maritime liens since, even if proved, these rank in priority after registered United States mortgages, so there are no proceeds remaining to satisfy these alleged liens. (May 13, 2003 Hearing Transcript at 119-120, hereinafter referred to as "Tr.").

19058164 v4

Except for S.C. Engineering, which also claims a possessory lien, no further briefing is needed on the various lien claims for the provision of necessaries that rank in priority below the ship mortgages. There are no lienable proceeds remaining for these claims after the mortgages exhaust the proceeds, and none of the lien claimants for necessaries supplied to a vessel, except S.C. Engineering, presented evidence at the May 13, 2002 hearing.

Therefore, the only contested matters, other than the claim of S.C. Engineering, to be addressed herein are the claims of the Unions and of CSX, both of which are opposed by the Trustee.

## II.  **MARITIME LIEN CLAIMS OF MEBA AND ARA**

(1)  MEBA AND ARA HAVE NOT PROVEN ANY INJURY OR DAMAGE ARISING FROM NPR'S ALLEGED BREACH OF THE COLLECTIVE BARGAINING AGREEMENT

The only alleged breach of contract upon which damages are claimed by the Unions is of the "Sales Transfer" clause of the MEBA Collective Bargaining Agreement (MEBA Exhibit 2, Clause 41(c)) and the Compliance Clause (MEBA Exhibit 2, Clause 41(f)), and the companion clauses in the ARA contract (MEBA Exhibit 6, Section 62). The MEBA and ARA Collective Bargaining Agreements are jointly referred to as the ("CBA").

Clause 41(e)(i) provides that "In order to preserve the jobs of the Company's engineers covered by this Agreement, the Company agrees that should any vessel ... be sold ... to another entity ... for operation under the U.S. flag...the vessel will be sold or transferred with the full complement of engineers last employed on said vessel." (MEBA Exhibit 2).

19058164 v4

Clause 41(e)(2) requires the selling employer, NPR, to obtain a written agreement that Buyer (a) will not terminate such employee without cause, (b) for the life of the vessel, with wages and benefits at least equal to that as if the current employment continued, (c) with disputes resolved by the American Arbitration Association, and (d) that the agreement be enforceable by the Unions. (MEBA Exhibits 1 and 2).

If the Company (NPR) fails to secure the continued employment of the crew, it "…shall be <u>liable to the Association [Unions]</u> in the sum certain amount equal to the <u>total employment costs</u> of a full complement of engineers on each involved vessel for a period of three years. Such sum shall be distributed by the Association to the engineers injured by the Company's breach and <u>shall not be reduced by the interim earnings of such engineers or for any other reasons…</u>" Clause 41(g)(2) (emphasis added). (MEBA Exhibits 1 and 2).

It is undisputed that there was no written agreement between NPR and Buyer, Sea Star, to employ these seamen in the Court approved sale of April 26, 2002. But it is also undisputed that the crewmen sustained no injury because the Buyer continued to employ them after the sale.

The three vessels at issue, MAYAGUEZ, HUMACAO and GUAYAMA were sold to Sea Star on April 26, 2002 pursuant to the April 26 Order. Concomitantly, Sea Star continued the employment of the full complement of MEBA engineers and the ARA radioman on board. Walter Curran, a former Holt employee with personal knowledge of the sale of the vessels, confirmed that on April 26, 2002 each was sold with a full complement of engineers and the radioman, who became employees of the purchaser, Sea Star. (Curran Tr. 113).

MEBA's Mr. Gallagher first denied knowledge of whether the engineers were employed on the vessels after April 26, 2002. (Gallagher Tr. 57). However, he subsequently recalled that the engineers did work for Sea Star after the sale in April 2002, until HUMACAO and GUAYAMA were scrapped. (Gallagher Tr. 64). Scrapping the vessels in the Far East ended the life of the vessels as described in the CBA Section 41(e)(2) (Gallagher Tr. 64), so the CBA requirement for the crewmen's continued employment was fulfilled despite the lack of a written agreement. The MAYAGUEZ crews, after working for Sea Star, were employed by the subsequent purchaser, CSX. (Gallagher Tr. 65). Mr. Gallagher admitted that MEBA negotiated the employment contract for these engineers with Sea Star (Gallagher Tr. 64). CSX already had a MEBA contract. (Gallagher Tr. 65).[*]

Mr. Gallagher had testified that the injury sustained by the seamen was that they lost their jobs onboard the vessel when the vessel was sold by NPR. (Gallagher Tr. 63). Mr. Gallagher stated when asked "What's their injury?" that "They're injured -- their job rights -- the jobs they lost onboard the vessel when the vessel went away." (Tr. 63). This statement is inaccurate. No such injury was sustained by any of these crewmen since they continued to be employed onboard the vessels after the sale. The very injury complained of was avoided. The employment protections of the written agreement were not needed. Since no seaman was harmed there is no reason to penalize the Trustee with three (3) years "total employment costs" for a hypothetical complement of crewmen (totaling over $13 million dollars).

---

[*] For the avoidance of doubt, MEBA/ARA presented no evidence about the terms of the employment of these crewman by Sea Star and CSX. Even if the employment was on terms other than the relevant CBA, that is not a breach of the CBA. The CBA expressly provides that the purchaser is not required to "accept or adopt" the CBA. (MEBA Ex. 2, Cl. 41 (e)(3)).

19058164 v4

(2)   THE AMOUNTS CLAIMED BY MEBA AND ARA ARE NOT "WAGES" WITHIN THE MEANING OF THE STATUTE AND DO NOT GIVE RISE TO A MARITIME LIEN

(a)   Analysis of MEBA's Claim of Maritime Lien for Seamen's Wages

Seamen's wage claims are statutorily created and are the highest priority maritime lien against a vessel, after the costs of administering justice during the *custodia legis* period when the lien is executed and the vessel foreclosed upon and sold.  46 U.S.C. §31301(5)(D).  The Federal statute creates a maritime lien for "wages;" however, it creates no lien for compensation, employment costs (or "total employment costs"), or benefits.

Courts have consistently held that "wages" that support a maritime lien must be due directly to a seaman, in a current, quantifiable amount for his service onboard the vessel.   Such compensation can include earned wages, vacation pay, transportation expenses, overtime and severance pay, but only where these provide a present direct financial benefit to a particular seaman.  *Bender Welding and Machine Company Inc. v. MV SOVEREIGN*, 415 F. Supp. 772, 774 (S.D. Al. 1976) (severance pay claims were all made by, and payments made directly to, individual seamen for a specific period of service onboard a specific vessel).  See also, *Citibank N.A. v. Vessel AMERICAN MAINE*, 865 F.2d 24, 27 (2d Cir. 1988) (discussed *infra*).

Conversely, contributions to union vacation plans, health funds, pension funds or other union funds, rather than to a specific seaman, are not wages and, therefore, do not result in the creation of maritime liens.  *Nehrig v. Steamship M/V POINT VAIL*, 901 F.2d 1044, 1049 (11th Cir. 1990).   There are no reported cases deeming employer contributions to a seamen's union fund to be "wages" entitled to maritime lien status.

19058164 v4

Simply stated, to give rise to a seamen's wages lien, the compensation must: (i) provide a present money benefit directly to the seaman, (ii) as a *quid pro quo* for that seaman's service onboard the particular vessel upon which the lien is asserted, (iii) for a specified period of time. Thus, monies due from an employer to funds created by seamen's unions do not constitute "wages" of a seaman for the purposes of creating a maritime lien—even if some of these funds ultimately benefit seamen union members. *West Winds Inc. v. MV RESOLUTE*, 720 F.2d 1097, 1099 (9th Cir. 1983) ("wages" did not give rise to a maritime lien where seamen did not allege any current loss of financial benefits to themselves caused by the employer's failure to make contributions to union funds for fringe benefits). Citing at length the principles of statutory interpretation, the *West Winds* Court stated that the statutorily created maritime lien for seamen's wages would have to be amended by Congress, not by the judiciary, to expand the lien to compensation other than wages. *Id.* See also, *Cross v. S.S. KAIMANA*, 401 F. 2d 182 (9th Cir. 1968) (*per curiam*) cert. denied 393 U.S. 1095, 89 S.Ct. 879, 21 L Ed. 2d 785 (1969).

In *Prudential Insurance v. United States Lines Inc.*, 915 F.2d 411 (9th Cir. 1990), the Court noted that every published opinion addressing employer contributions to a union fund concluded that such contributions are not "wages" of the crew. *Id.* at 412. In that case, a deck officers union, Masters, Mates & Pilots ("MM&P") and various individual seamen appealed from a District Court's judgment dismissing their claim for a preferred maritime lien against defendant vessels for unpaid contributions to an individual retirement account plan. The appellant seamen argued that, as individual plan participants, they lost benefits because the plan reduces the employee's base share by the amount due from a delinquent employer. However, the Court noted that because the contributions were "due the trust rather than the seamen; the seamen themselves had no

entitlement to the employer's contribution." *Id.* Therefore, the contributions to the retirement plan trust fund were not wages for the purpose of creating a maritime lien.[*]

In *Prudential* the United States Court of Appeals for the Ninth Circuit reviewed its decision in *West Winds* and reiterated that an employer's contributions due to a union trust fund to which the employees have no immediate entitlement are not "wages" of the crew for the purpose of creating a maritime lien. *Id.* at 413. This statement is true even where the employees may ultimately receive contributions, or where the "wages" were used to fund future benefits.

MEBA has been similarly unsuccessful in establishing maritime lien status for employer contributions to union funds. In *Citibank N.A. v. AMERICAN MAINE,* 865 F.2d 24 (2d Cir. 1988) the United States Court of Appeals for the Second Circuit affirmed the District Court denial of MEBA's motions for summary judgment, which asserted that an employer's contribution to a union pension fund created a preferred maritime lien. The contribution was due to the fund, not to the seamen, and had no current value to the seamen—who could only benefit at some future date. *Id.* at 25-26. See also, *Puerto Rico Maritime Shipping Authority v. Point Vigilance Corp.*, 643 F. Supp 661 (M.D. Fl. 1985) (employer contributions to MEBA pension plan did not create a maritime lien).

The Debtor has fully paid all seamen's wages with respect to M/V GUAYAMA, M/V HUMACAO, M/V MAYAGUEZ and M/V CAROLINA. The Unions' claims *sub judice* are for amounts allegedly <u>due to the Unions</u>, which may be invested, administered and disbursed by the Unions in accordance with its rules—none of which have been disclosed to this Court. The claimed amounts are not due directly to any specific seamen

---

[*] As here, the claimed "total employment costs" are not paid to the seamen, but are expressly made due to "the Association" ( i.e. MEBA and ARA).

19058164 v4

for service onboard a vessel. Therefore, no lien may attach, and these claims do not constitute "seamen's wages."

MEBA generally claims that seaman's "wages" of $11,584,184.10 are due to its licensed engineer personnel; however, MEBA has submitted no evidence of any amount certain due to any specific seaman. Likewise, ARA seeks $2,018,889.12 for the Union, without specifying any sum due to any individual radioman. Notably, the amounts are allegedly due to an unspecified Union account to be administered in the Unions' unfettered discretion. The Unions submitted no evidence concerning their management of the fund. Rather, the Unions have open-ended discretion to administer these funds. This account, therefore, creates less of a calculable benefit to the individual seaman than the established union funds for pensions and other benefits, which at least have rules to govern when the seaman might receive a payment. The Unions never submitted evidence concerning: (1) to what fund the money would go, (2) how the fund would be administered, (3) what union members would be entitled to payments from the fund, (4) when payments would be made, and (5) upon what criteria payments would be made.

MEBA's witness, Mr. Gallagher testified that his understanding was "that some certain amount is wages to be turned over to the individuals that were injured by the breach of contract." (Gallagher Tr. 68) (emphasis added). He did not know, however, what portion of the claim this amount represented, nor to whom it would be paid. (Gallagher Tr. 68-69). Simply, the Unions have not submitted evidence of any quantifiable monetary benefit to any specific seaman as a result of his or her service onboard a particular vessel for an identified period of time. The Unions have not met even the most minimum burden of proving the claimed amount is "wages."

The Unions refuse to disclose how they will administer any funds received in this litigation. MEBA's only witness did not know. (Gallagher Tr. 45). He speculated it

might go into an escrow for "the injured parties" (Gallagher Tr. 46) but could not say who the injured parties were, or the terms and conditions of the escrow. However, MEBA made clear that <u>it</u> would administer the funds (Tr. 45) not any seaman.

The Unions cannot identify any seamen to whom the alleged dismissal compensation is due. They imply injured seamen could include those last employed onboard the vessels, but then refuse to say these are <u>the</u> injured seamen who will get the money. On the contrary, Mr. Gallagher testified that there were more crewmen than just those last onboard the vessels who would have been "injured" by the sale of the vessels (Gallagher Tr. 68). He did not know who or how many. (Gallagher Tr. 68-69). Even MEBA concedes that there are unnamed, unidentified union members who are the Unions' intended beneficiaries of the windfall that its requested penalty would provide. The alleged dismissal claim cannot be mitigated by the actual earnings of any specific seamen; therefore; it is not wages to any seaman, but a penalty to be paid to the Unions. (MEBA Exhibits 1 and 2, Clause 41(g)(2)).

MEBA argues that the cases refusing to grant maritime lien status, as cited above, are inapplicable because the compensation "flows through the unions" and "is paid to specific employees." Pre-Hearing Brief ¶ 35, p. 13. The Unions, however, have painstakingly avoided submitting any evidence regarding any seaman who may receive the funds, or the amounts due to any such seaman.

MEBA even refused to disclose employment histories identifying which engineers served on the relevant vessel. (Tr. 49-50). It deemed this information irrelevant, because the penalty charged is a hypothetical calculation based on the billet (job title, e.g. Chief Engineer, 1st Engineer, etc.) for three years after the vessel is sold—even though no specific individual ever filled that job for that time. (Gallagher Tr. 52, MEBA Exhibit 5, Gallagher Tr. 60-62). In fact, Mr. Gallagher testified that the claimed

total employment cost he calculated (in MEBA Exhibit 5) is based on a daily billet cost, not compensation for any particular individual or individuals. (Gallagher Tr. 71-73). He further testified that it included the full scope of the negotiated compensation package for the specified job, future wages, pension rights and other economic benefits. (Gallagher Tr. 66-67).[*] In other words, the "total employment costs" calculation includes all the contractually related fringe benefits, pensions, medical etc., that the above-referenced case law has found do not constitute wages.

MEBA admits that there were multiple crews for each vessel (Gallagher Tr. 68), at the least a crew and a relief crew (Gallagher Tr. 58, 68), and that its members could be randomly assigned to the ships from the hiring hall. (Gallagher Tr. 58-59). Thus, MEBA cannot even identify which seamen were allegedly injured by the sale of the vessels. (Gallagher Tr. 59-60). MEBA's witness claimed he could name one individual from the GUAYAMA, Mr. Blankenship. Mr. Blankenship was allegedly "permanent," so he would return to the vessel after vacation (Gallagher Tr. 48). He then admitted that this permanent status was for the convenience of NPR, who could change it at any time and get a replacement from the union hall. (Gallagher Tr. 60). Although MEBA and ARA argued that there were some unidentified "permanent" positions, where the same individual returned to a particular vessel after his vacation, it was undisputed that multiple engineers and radioman were required to rotate through these billets. Furthermore, the Unions had the right to replace a seaman with another for any vessel. (Curran Tr. 122).

---

[*] Mr. Gallagher stated he did this because this was ". . . the economic component of the billets that are involved on the vessel, the total employment cost" (Gallagher Tr. 55-56). That these fringe benefits are part of an Owner's overall costs does not make them wages for which the vessels liable *in rem*. See *supra* pp. 6-9.

ARA, with fewer personnel, does no better. Their witness admitted, as had MEBA's, that there were no outstanding unpaid paychecks due to crewmen for service onboard the vessel(s) prior to the sale on April 26, 2002. (Lindner Tr. 102, Gallagher Tr. 75, Stipulation by MEBA and ARA). Mr. Lindner admitted that, as with MEBA, no amounts were calculated as due to any individual for any period of service on a ship, just a hypothetical three year period (no start or finish date) for a hypothetical "total employment cost" for each billet. (Lindner Tr. 95 and 100).

The Unions' witnesses admitted that total employment costs included not only prospective base wages (or what would have been wages if any work had been done) but also union fees for pensions, vacation, medical, training and other union funds. (Gallagher Tr. 66-67, 53-55; Lindner Tr. 90-95). ARA specifically noted that some of the claimed "wages" were to be used to pay the Unions' administrative costs for handling the funds. (Lindner Tr. 94). Mr. Lindner himself is not part of the ARA, but an administrator of the union benefit plans. (Lindner Tr. 100). The existing case law clearly states that payments to these union funds are not seamen's wages that give rise to a maritime lien, and therefore, these claim clearly fall outside the scope of seamen's "wages." *Supra* at pp. 6 to 9.

Walter Curran explained that once the money goes into the Unions' funds it can be moved around to bolster any of the other funds. (Curran Tr. 115-117). Thus, there is no way to tell who the beneficiaries of the amounts claimed herein ultimately would be, even seamen who never worked on any NPR vessel.

The Unions have failed to prove (i) that any seaman is entitled (ii) to a current sum certain, (iii) for his or her service onboard a specific vessel for a specified period of time. Therefore, the Unions have failed to prove a maritime lien for seamen's wages was created.

19058164 v4

(b)    MEBA'S and ARA's Citations to Authority do not Support a Claim of Maritime Lien

We refer to the cases cited by MEBA and ARA in their Pre-Hearing Brief (Docket Nr. 3010).

In arguing that "dismissal compensation" under a collective bargaining agreement constitutes "seamen's wages" the Unions rely upon *Long Island Tankers Corporation v. S.S. KAIMANA*, 265 F. Supp. 723, 726 (N.D. Cal 1967), and *Gayner v. New Orleans*, 54 F. Supp. 25 (N.D. Cal 1944). MEBA Pre-Hearing Brief ¶ 24.

*Long Island Tankers* was appealed as *Cross v. S.S. KAIMANA*, 401 F. 2d 182 (9th Cir. 1968) (*per curiam*) (cert. den) 393 U.S. 1095, 89 S. Ct. 879, 21 L. Ed. 2d 785 (1969), where in a one sentence opinion, the Ninth Circuit adopted the reasoning of the District Court and held that employer contributions to union funds do <u>not</u> constitute wages of the crew and do <u>not</u> form the basis of a maritime lien.

In *Gayner v. The NEW ORLEANS*, 54 F. Supp. 25 (N.D. Cal. 1944), severance pay was allowed as seamen's wages. However, the "severance" was paid directly to individual seamen, not to a union, and was in proportion to each individual's length of service on a particular vessel. <u>Id</u>. at 26. Thus, there was a direct and immediate benefit to the seamen by way of a payment that was linked directly to the seaman's period of service onboard the specific vessel. See *infra* at 15.

To the contrary, in this case the Unions do not assert or prove that even one dollar is currently payable to any individual seaman. Furthermore, the relevant time-period asserted by the Unions is three years <u>after</u> the ship is sold, not for a seaman's actual time of service onboard the vessel. In fact, the penalty is not tied to any particular term of service aboard the vessels. Taken to an extreme, if a vessel were sold one day after

19058164 v4

commencement of the contract term, under the Unions' theory, it would be entitled to three years of pay as "wages." Since the alleged damages cannot be mitigated by the amounts any seamen earns during that three-year period (MEBA Exhibits 1 and 2, Clause 41(g)(2)) underscores that these claims are <u>not</u> for the wages of any particular seamen.

The Unions' argument that "dismissal compensation" is seamen's wages is not supported by the string cited cases at Paragraph 29 (page 10) of the Union's Pre-Hearing Brief. The cases cited for this proposition include *New York Post Corp. v. Commissioner*, 40 T.C. 882, 889 (U.S. Tax Ct. 1963) and *Bendex Radio Corp. v. Hoy*, 207 Md 225 232 (1955). These cases are non-maritime cases, not *in rem* cases, and do not concern seamen, seamen's wages or maritime liens.[*]

Similarly the Unions rely upon *Paul v. All Alaskan Seafoods, Inc.*, 106 Wn. App 406, 417, 24 P.3d 447, 4523 p.30 (2001) and *Vitco v. Joncich*, 130 F. Supp 945, 951 (D. Cal 1955) which involved unique aspects of the law related to fishermen and their share of the catch, but were not *in rem* claims against the vessels, were not maritime lien claims nor did they discuss the statutory definition of seamen's wages. These cases did not involve severance pay or dismissal compensation. Likewise, *Carslund v. United States*, 88 F. Supp. 105, 106 (D. Cal 1950) was a seamen's personal injury case and was not *in rem,* so did not involve maritime liens or seamen's wages.

The A.L.R. article, cited by the Unions, has only one reference to a maritime case, that is, *Gayner v. The NEW ORLEANS*, 54 F. Supp 25 (N.D. Cal. 1944) The annotation

---

[*] In Paragraph 32 of its Pre-Hearing Brief, the Unions cite *In Re Public Ledger, Inc.*, 161 F. 2d, 762, 771 (3d Cir 1947) and *In Re Elliott Wholesale Grocery Co.*, 90 F. Supp 1017, 1019 (S.D. Cal 1951), both non-maritime, non-lien cases with nothing to do with seamen's wages. MEBA and ARA citations to non-maritime cases, or maritime cases that do not implicate the maritime lien statutory interpretation of the word "wages" are of no precedential, nor even persuasive value.

19058164 v4

Construction and Effect of Severance on Dismissal Pay Provisions of Employment Contract or Collective Labor Agreement, 40 A.L.R. 2d 1044 (1955) makes clear that Gayner was a unique case where the dismissal benefit was based upon services actually rendered onboard vessels by seamen facing a tangible and imminent loss of their jobs due to probable abandonment of the ferry service. As discussed above, unlike the current claims, the payments in Gayner were owed directly to named seamen in amounts calculated based upon their length of prior service onboard the ferryboats. 40 A.L.R. 2d 1044, West's pages 33 of 39.

The Unions also cite *Bender Welding and Machine Co. v. M/V SOVEREIGN OPAL*, 415 F. Supp 772, 777, which states that wages, vacation pay, transportation expenses, overtime and severance can be "wages" for maritime lien purposes, but only where these provide a present direct financial benefit to the particular seaman. In that case, all the claims were made by individual seamen and all payments were made directly to such seaman, not to a union fund.

(3)    COMPARISON TO MASTERS' MATES' AND PILOTS' (MM&P) SEAMEN'S WAGE CLAIMS

The Unions' claims herein are dramatically different from the claims submitted in this proceeding for the seamen enrolled in the Masters, Mates and Pilots ("MM&P"), with whom the Trustee has settled maritime lien claims. MM&P seamen specified certain amounts due directly to specified individuals for such individual's service onboard specified vessels for the period April 1, 2002 through April 26, 2002. (MM&P Claim dated June 14, 2002). The MM&P collective bargaining agreement makes the Owner/employer directly liable to the seamen, not the Union, in the event of the employer's failure to pay these amounts. (Exhibit C to MM&P Claim, section 2.08). Therefore these amounts were due directly to specified seamen (each individual to

19058164 v4

receive a certain amount) for a specific period of time of service onboard an identified vessel.

These claims totaled $113,216.09 of MM&P's claim for $219,658.81, and the Trustee settled this portion of MM&P claims for $95,600 in recognition of the arguable maritime lien status. The other claims by MM&P for amounts due to that <u>union</u> for various union benefit funds were not deemed to have maritime lien status, were not settled, and remain outstanding as unsecured claims.

Contrary to the MM&P claims, MEBA and ARA argue only for money that is due to the Unions, not the individuals, and not for specific services for a specific period of time onboard the vessel. Therefore, there is no colorable argument that such claims give rise to a maritime lien.

(4)    <u>THE CLAIMS OF MEBA AND ARA ARE UNENFORCEABLE PENALTIES</u>

When NPR Inc. sold all of its assets in these cases in April 2002, it was clear that it retained no equity interest in the proceeds arising from the sale of the vessels. Rather, the mortgagees, represented by Wachovia, having $75 million mortgages on each vessel exhausted the proceeds of sale of the vessel prior to any Owner's equity interest.[*]

The alleged "dismissal compensation" payments asserted by the Unions are penalties akin to statutory double wage penalties. While double wage penalties are not implicated in this matter, the Fifth Circuit decided in *MARIA SJ* (*Bank of Scotland v. SABAY*) 211 F.3d 261 (5th Cir. 2000) that the vessel would not be liable *in rem* for statutory penalty wages when the owner had no equity remaining in the vessel.

---

[*] The values of these vessels range from $900,000 to $1,900,000 (Mollard Tr. 30, Trustee's Exhibit E).

19058164 v4

In *MARIA S.J.*, seamen sought to enforce a maritime lien for statutory "penalty wages" against the proceeds of the *in rem* sale of that vessel where the mortgage bank was the only competing claimant to the funds. The Fifth Circuit, affirming the District Court decision, held that such a penalty could not be enforced to the detriment of the mortgagee where Owner, who incurred the penalties and was the party statutorily liable for them, had no equity interest in any of the proceeds. *Id.* It would have been patently unfair to punish the mortgagee bank for the alleged acts of the Owner.

Also, under generally accepted contract principles, these claims are unenforceable penalties and not liquidated damages. To be enforceable, liquidated damages must bear a reasonable proportion to the probable loss, and the amount of the actual loss must be incapable or difficult to precisely estimate. *Trans. World Airlines, Inc. et al. v. Trans. World Airline Inc.*, 145 F. 3d 124, 134 (3rd Cir 1998). The Unions have presented no evidence of any actual damages, and refused to produce documents relating to the seaman's work histories (Tr. 48-51). Despite stories of the arduous work environment and claims of difficulty finding jobs (Gallagher Tr. 44) the Unions have not put on evidence of any seamen being out of work for any period of time since April 26, 2002. Therefore, there is no basis to assert that three (3) years compensation is rationally related to any seamen's actual loss of employment. Clearly the alleged three years worth of total employment costs, $13,000,000, is excessive and is not intended to ameliorate the damage suffered by any individual seamen—as evidenced by inability to show earnings of any seamen during the three year period to mitigate the alleged damages. This fact alone is sufficient to establish that these amounts are unenforceable penalties, not liquidated damages.

19058164 v4

III.    **S.C. ENGINEERING (NECESSARIES)**

As indicated supra at p. 3, liens for necessaries rank after ship mortgages, so there are no funds left from the proceeds of sale after satisfying the ship mortgages to pay any necessary liens. None of the necessary lien claimants presented evidence on May 13, 2002, except S.C. Engineering.

S.C. Engineering Co., Inc. has asserted a lien for necessaries, but also argues that it is secured by a possessory lien over equipment in its possession: two main circulating pump rotating elements and one main circulating pump and motor assembly all said to be from the vessel MAYAGUEZ. This equipment also is claimed by the current vessel owner, Horizon.

With respect to its claim of maritime lien, to the extent S.C. Engineering had a claim for necessaries, which is not admitted, it ranks after the ship mortgages and, therefore, there are no sale proceeds left to pay S.C. Engineering's alleged lien claim.

IV.    **NON-MARITIME LIEN CLAIM FOR INTERLINE CONSTRUCTIVE TRUST OR LIEN OF CSX**

CSX claims that certain portions of the NPR accounts receivable are being held in trust for CSX on the basis of an interline lien and therefore could not be sold to Sea Star Line. CSX's claim is unfounded for two reasons. *First,* as admitted by CSX's only witness, CSX and the Debtor have a debtor-creditor, not an interline, relationship (Crawford Tr. 165). *Second*, even if an interline relationship were found, which is denied, CSX has failed to carry its burden of identifying and tracing the purported interline funds.

19058164 v4

(1)    **CSX Has No Interline Lien**

    (a)    <u>**Standard for Creating an Interline Lien**</u>

Interline shipments travel by more than one carrier and, by agreement among the carriers, either the carrier initially accepting the goods for shipment or the carrier delivering the goods to their destination serves as the "collecting" carrier (*i.e.*, the carrier that collects payment for the entire shipment from the customer). *In re Delaware & Hudson Ry. Co.*, 127 B.R. 756, 757 (Bankr. D. Del. 1991). The collecting carrier acts "merely as a receiving and transmitting agent," holding monies owed to the other interline carriers. *In re Penn Central Transp.*, 486 F.2d 519, 523-534 (3d Cir. 1973) (holding that "transportation and freight charges, *when collected*, are held in trust for the Interlines.") (emphasis in original). If the collecting carrier fails to remit the interline funds, the other interline carriers can assert an interline lien on funds owed to them. *See id.* at 531 (finding that a debtor, even though in bankruptcy, must pay interline balances it owes other interline carriers).

However, not all multiple carrier relationships are interline agreements—some are simply a debtor-creditor relationship. *Compare In re Schulman Transp. Enter., Inc.*, 33 B.R. 383, 385-86 (Bankr. S.D.N.Y. 1983) (finding that freight-forwarding service and air carrier transacted business as creditor and debtor, not as interline carriers) *with In re Penn Central*, 486 F.2d at 524 (holding that railroads conducted business as interline carriers, not as creditor and debtor).

There are significant differences between carriers in an interline relationship and those in a debtor-creditor relationship. If a debtor-creditor relationship exists, then the creditor has no equitable interest in the monies the ultimate shipping customer owes to the debtor. Therefore, upon the debtor filing for bankruptcy, that money becomes

19058164 v4

property of the estate. *See* 11 U.S.C. § 541(a) ("all legal or equitable interests of the debtor in property as of the commencement of the case" become property of the estate). Unlike the interline relationship, a debtor-creditor carrier relationship does not support a lien on the debtor's funds the creditor carrier is simply a general unsecured creditor.

CSX argues that the "Transportation Trust Doctrine" (also called by them the "interline" or "railroad" trust doctrine) began with the decision *In Re Penn Central Transp. Co.*, *supra*. (CSX Post-Hearing Brief at p. 8). The concept "Transportation Trust Doctrine" does not appear in that case, which merely recognized that the railroads had chosen to deal with each other on an interline basis. That Court specified that "The parties' manifestation of intention ultimately controls whether or not a trust relationship exists. . .". *Id*. at 524.

Here, the task of divining the parties' intent is simple. CSX's only witness, Mr. Crawford, clearly stated that the contract with NPR was a simple shipper-carrier relationship, not an interline trust agreement. (Crawford Tr. 166-167).

Upon cross-examination, Mr. Crawford testified that unlike an interline agreement, where one carrier in a string of different carriers of the same cargo bills for all the carriers services and apportions the amount collected, NPR was responsible for paying CSX even if NPR's customer had not paid. He stated:

"Q. [Yudes] My point is that you've already testified that you did -- that they [NPR] had to pay the bill regardless of whether their customer paid them or not, right?

A. [Crawford] Correct." (Crawford Tr. 166).

There is clearly no agreement between the carriers to apportion the receipts from the ultimate customer.

To determine whether the relationship between carriers is that of a trustee-beneficiary, as in the interline trust relationship, or debtor-creditor, courts look to the following factors:

- Whether the collecting carrier commingles the monies collected with its general revenues;

- Whether the collecting carrier pays interest on monies collected;

- Whether there is an agreement between the collecting and other carriers to apportion the collected funds;

- Whether there is a relationship between the amount the collecting carrier owes the other carrier and the amount the collecting carrier charges the customer;

- Whether the collecting carrier remains liable to the other shipper even if the customer does not pay for the shipping service; and,

- Whether the other carrier, in agreeing not to demand immediate payment for services rendered, characterizes this demand delay as a credit accommodation, subject to suspension if payment is not timely made.

*In re Penn Central* 486 F 2d at 524, 526-27 (citations omitted).

*Penn Central* illustrates how these factors apply. In *Penn Central*, the Penn Central Railroad ("PCRR") and other railroads were parties to a complex accounting arrangement whereby each railroad performed interline shipping services for the others. *Id.* at 521. Periodically, the railroads settled their accounts with each other, subtracting the net services each provided from the interline monies it had collected for the other railroads. *Id.* at 523. Once the accounts were settled, the amount owed to the other railroads became payable immediately. *Id.* After PCRR filed for bankruptcy, it refused to turn over interline funds it owed the other railroads, *id.* at 522, claiming that it had a

debtor-creditor relationship with them. *Id.* at 524.   The *Penn Central* court held otherwise, finding instead the existence of a trustee-beneficiary relationship between PCRR and the other railroads because (1) the interline accounts were not subject to an interest charge, (2) though PCRR commingled the funds, separating interline funds was impracticable given the innumerable daily interline transactions among the interline carriers, (3) PCRR and the other carriers had an agreement to apportion the collected funds, (4) what PCRR owed the other carriers depended directly on the charges paid by PCRR's customers, and (5) PCRR was obligated to pay the interlines immediately once the accounts were settled, so no credit between the interlines was involved. *Id.* at 524-28.

### (b)    CSX Has No Interline Lien or Trust

CSX testified that there was no interline agreement with NPR.  (Crawford Tr. 165).    Mr. Crawford described an interline agreement, and the concomitant apportionment of billing between two or more carriers of the funds received from a single customer under such an agreement, and clearly stated that the deal with NPR was not that type of deal.  He testified that NPR had to pay whether they collected from their customer or not. (Crawford Tr. 161, 166-167).  NPR was CSX's customer, and NPR was the party billed by CSX for the carriage of cargo, not NPR's customer. (Crawford Tr. 161).  It was NPR funds that were used to pay CSX.  NPR's customer's payment was not the source of funds nor could NPR wait until it collected from the customer to pay CSX (Crawford Tr. 161-162).  CSX did not know, or care, who NPR's customer was.  (Crawford Tr. 164).

CSX was clear that the amounts NPR could collect or charge its customers were irrelevant to CSX, since NPR had to pay CSX based on the NPR-CSX contract, not an apportionment of what NPR billed its customers. (Crawford Tr. 167).  Also, CSX never looked to NPR's ultimate customer for payment. (Crawford Tr. 169).

19058164 v4

CSX is simply a creditor of NPR with no special rights in any particular funds.

In the present case, the *Penn Central* factors point toward a debtor-creditor relationship between NPR and CSX:

*First*, NPR did not have separate accounts for CSX and NPR funds. Rather, all collected monies, regardless of source, went into a general NPR revenue fund out of which general revenues CSX and other creditors were paid. Unlike *Penn Central*, the commingling reflects that NPR placed no money in trust for CSX, and simply paid CSX when invoiced. *See, In re Coupon Clearing Serv., Inc.,* 113 F.3d 1091, 1101 (9th Cir. 1997) (finding that bankrupt food coupon processing company did not hold funds in trust for grocery store clients, in part, because contract governing payment of funds neither required debtor to segregate funds nor forbade commingling of funds).

*Second*, CSX charged NPR a shipping rate fixed by contract, which did not depend on what NPR charged or collected from its customers. *See* CSX Exhibit 4 Contract, § 5.1.

*Third*, NPR remained liable to CSX regardless of whether the customer paid NPR. Though the contract grants CSX the right to collect monies from any delinquent NPR customers, this right did "not, in any way, discharge or modify [NPR's] obligations under" the contract (*Id.*, § 8.3), including the obligation to pay CSX for all transportation charges. *Id.*, § 8.2;

*Fourth*, the CSX contract characterizes CSX as extending NPR credit, as NPR must pay CSX for rail transportation services within 15 or 30 days after the CSX invoice date. The contract describes this 15 or 30-day delay as "the extension of terms/credit to [NPR]." *Id.*, § 8.1. The credit extension depended on NPR meeting CSX's credit qualifications. *Id.*, § 7 (titled "CREDIT QUALIFICATIONS AND

PAYMENT TERMS"). *See In re Chicago Express, Inc.*, 222 F. Supp. 566, 572 (S.D.N.Y. 1963) (finding funds collected from customers by bankrupt trucking company were not held in trust for railroad, in part, because contract characterized the provision permitting the trucking company to pay railroad within 15 days of being billed as a "credit accommodation"). The CSX agreement does not waive interest, which would certainly be part of a contract breach claim for failure to pay freight owed if it had not been for this bankruptcy.

*Fifth*, and most importantly, there is no agreement between NPR as the alleged collecting carrier and CSX to apportion collected funds.

Therefore, NPR and CSX had a debtor-creditor relationship with no interest of CSX on any particular funds collected by NPR.

### (2)    CSX Has Failed to Identify and Trace Purported Interline Funds

Even if it could establish an interline relationship with NPR, CSX still is not entitled to recover any interline funds, because it has failed to identify and trace the alleged interline funds in its moving papers. *See In re Columbia Gas Sys.*, 997 F.2d 1039, 1064 (3d Cir. 1993) (noting that beneficiaries of a constructive trust "bear the burden of identifying and tracing trust property"). Interline claimants lose their restitution claim to interline funds by failing to carry this burden:

> [T]o sustain a claim to trust property or to an equitable lien thereon, the claimant must depend upon his ability to identify the property in its original or substitute form in the hands of the [debtor]. . . . The basic idea of the trust doctrine as applied in bankruptcy is a fair and reasonable identification of the property or fund so as not to harm other creditors. It is not enough, therefore, to show merely that the funds or property came into the bankrupt's hands . . . the claimant must assume the burden of ascertaining and tracing the trust property, and where it is alleged that such property has been

> converted into other property in the hands of the bankruptcy, the
> claimant has the burden of tracing the trust property thereon.

*In re Lehigh & New England Ry. Co.*, 657 F.2d 570, 579 (3d Cir. 1981) (citation omitted).

The interline funds, if any, could only be those collected from NPR customers for whom NPR used CSX as a rail carrier. Here, CSX fails to identify those customers or the interline funds allegedly held by the Debtor, and simply alleges that the Debtor collected some interline funds. *See* CSX Objection ¶ 10, 11, 15, 17. Nowhere does CSX identify which funds are alleged to form an interline trust, from which transportation customers such funds came, or the dates upon which such funds were paid. Absent this evidentiary showing, CSX cannot establish its restitution claim for interline funds.

## V.    **PROCEEDS OF SALE**

### (1)    Maritime Liens

A maritime lien is an internationally recognized non-possessory property right of a non-owner creditor to enforce its claim *in rem* against a vessel and its appurtenances. The alleged lien attaches only to the specific vessel upon which the lien arises.

The maritime lien attaches to the vessel, and its appurtenances. Appurtenances include equipment onboard the vessel necessary for its navigation or for the provision of services by the vessel. It can also include equipment stored off the vessel if explicitly designated for that vessel. There is no evidence that there was any such stored equipment designated for any one of the vessels.

A maritime lien extends to pending freight, that is the earnings of the vessel for carrying cargo or the amount paid for the use of the vessel. *N.H. Shipping Cargo v. Freights of S.S. Jackie Hause*, 181 F. Supp. 165 (S.D.N.Y. 1960). However, the lien

19058164 v4

attaches only to pending freight (unpaid freight) for the voyage upon which the vessel was engaged when the lien arose. *Schirmer Stevedoring Co., Ltd. v. Seaboard Stevedoring Corp.*, 306 F. 2d 188, 192 (9th Cir. 1962). There has been no evidence offered that there was any pending freight, much less for what vessel or voyage. Therefore, there are no grounds to assert maritime liens against any sums except those directly attributable to the sale proceeds of the vessels themselves.

(2)    Breakdown of Funds:

Pursuant to the April 26 Order, NPR, Inc., San Juan International Terminals, Inc., Holt Hauling & Warehousing Systems, Inc., and Holt Cargo Systems, Inc. sold certain assets to Sea Star Line LLC pursuant to an Asset Purchase Agreement (the "NPR Sale"). (Trustee's Exhibit A). The Court approved certain payments by the Sellers for purposes of employee salaries and bonus retention program, which payments were made by the Sellers. (Trustee's Exhibits A & B). Wells Fargo Business Credit, Inc. ("Wells Fargo"), as DIP Lender, was also paid all of the obligations owed to it under a Credit and Security Agreement dated January 22, 2002. The Debtors deposited $800,000 from the NPR Sale proceeds into an escrow account subject to an alleged constructive trust fund claim of CSX Intermodal, Inc. An analysis of the distribution of the NPR Sale proceeds at the time of the NPR Sale is attached to this memorandum as Schedule B. Subsequently, this Court modified the April 26 Order and allowed the release of Wells Fargo's liens on the Debtors' assets. (Trustee's Exhibit C.) Wells Fargo has transferred the accounts and funds it held pursuant to this Court's order to the Trustee, except for funds held for a letter of credit and Wells Fargo's fees and expenses. A current reconciliation of the NPR Sale proceeds is attached to this memorandum as Schedule C. Approximately, $10,369,646.32 is available in regard to the asset portion of the sale.

19058164 v4

(3)    <u>Breakdown of Assets</u>:

The asset portion of the sale included the four vessels, NPR's leasehold interest in the San Juan Puerto Rico Terminal and miscellaneous equipment (Trustee's Exhibit A). The maritime lien claimants herein can only assert their *in rem* claim against that portion of the proceeds of the asset sale relating to the particular vessel upon which the lien arose.

The miscellaneous equipment consisted of motor vehicles, computers, office furniture and equipment, and other equipment in use at the San Juan Terminal. No information is available concerning the age or condition of such equipment, which would be the principal factors in determining value. As a result, no party has attempted to separately value the miscellaneous equipment.

However, the vessels and terminal leasehold are the subject of expert evidence submitted by the Trustee in order to allocate the proceeds from the asset sale as between the vessels and the terminal leasehold.

(a)    Terminal Leasehold

The Trustee engaged Arnold S. Tesh of FTI Consulting, Washington, DC to perform an appraisal of the Holt Group leasehold interest in the Port of San Juan, Puerto Rico as of April 1, 2000—when the Asset Purchase Agreement was entered into (Trustee's Exhibit D.)

The appraisal values this leasehold interest at twelve million nine hundred thousand dollars ($12,900,000).

Arnold Tesh of FTI Consulting, with over 35 years' experience in performing real estate appraisals, clearly established that the value to the buyer of the leasehold interests

in Puerto Rico when sold to Sea Star was $12,900,000. (Tesh Tr. 16-17, Trustee's Exhibit D, pp. 34-37).

MEBA argued at the hearing that this valuation wrongly assumed the leasehold was assignable, citing to the lease and Puerto Rican law. MEBA argued the Port Authority could withhold permission to assign the lease. (Tr. 20). However, the lease was assigned without objection by the Port Authority and the transaction was approved by this Court on April 26, 2002. There can be no issue about the lease's assignability.

Further, MEBA argued that any excess rent over the contract rent is payable by contract to the Port Authority, and erroneously argues that this denudes the leasehold of the inherent value. (See Tr. 24). MEBA mistakes the contract rent and market rent. Mr. Tesh testified that the value to the buyer is created because the contract rent is lower than market value rent. (Tesh Tr. 18). The Tesh valuation is based upon what the leasehold is worth to the Buyer, Sea Star; it acquired a lease where the contract rent is less than the market rent. The valuation done by Mr. Tesh is not the value to NPR (or the Port Authority). (Tesh Tr. 26-27).

The only evidence submitted to this Court of the leasehold value as of April 2002 is Mr. Tesh's valuation at $12,900,000.

(b)    Vessel Valuations

The Trustee engaged the shipbroking firm, Jacq. Pierot & Sons, to value the four vessels as of April 2002 as United States flag, Jones Act qualified vessels. The Valuation Certificates are Trustee's Exhibit E.

19058164 v4

The Valuation Certificates reflect the vessel values in April 2002 as:

| | |
|---|---|
| S/S CAROLINA | $   900,000 |
| S/S GUAYAMA | $1,900,000 |
| S/S HUMACAO | $1,900,000 |
| S/S MAYAGUEZ | $1,900,000 |
| | $6,600,000 |

(Mollard Tr. 30, 32 Trustee's Exhibit E).

CAROLINA was damaged, missing equipment and out of active service, and so was valued less than her three sister ships which were operating. (Mollard Tr. 30).

Mr. Mollard is uniquely qualified to value these vessels since he first became familiar with them when he sold them out of bankruptcy to NPR's predecessor almost twenty years ago. (Mollard Tr. 33). He also sold three of the four, HUMACAO, GUAYAMA and CAROLINA, for Sea Star in 2002. (Mollard Tr. 33-34). No competing valuations have been offered by any party.

MEBA has argued that the vessel valuations should be higher based on insured values, replacement values or alleged surveyor valuations (although surveyors do not usually value vessels, shipbrokers do (Mollard Sealed Tr. 13-15)). However, MEBA failed to submit any admissible evidence in support of these values. (Tr. 176-180, this Court, on objection, excluded MEBA Exhibit 12 and 13 and MEBA never offered Exhibit 14).

MEBA may argue that sale prices for the four vessels from Sea Star a few months after the NPR sale should control. This is erroneous. Mr. Mollard, as required by the Court's Order of April 26, 2002, valued the vessels in April 2002 as United States coastwise trading, Jones Act vessels purchased by a willing buyer—except for CAROLINA, which was out of service needing repair. Of the vessels sold by Sea Star,

three were sold for their scrap value, not for the Jones Act Trade, and the fourth drew a premium to continue operating in a market that had decreased competition because three of the four had been scrapped. (Mollard Sealed Tr. 18). That premium could not be available for each of the four ships; for, if they all remained in the market, the freight available for each would be reduced. (Mollard Sealed Tr. 15-16).

MEBA has also argued for an additional $1 million per ship in "spares" because certain "spares" were sold by Sea Star with the MAYAGUEZ to CSX. As explained by Mr. Mollard, these were fleet spares, stockpiled by the Owner for all of the vessels and were not spares for each vessel, and therefore do not add maritime lienable value to any given vessel. (Mollard Sealed Tr. 18). The spares left onboard each vessel were sold with the vessel for no additional price over the vessel sale price. (Mollard Sealed Tr. 18).

The only valid valuations of the four vessels, as of April 2002 as United States Coastwise Trading vessels are those done by William Mollard.


(c)    Allocation of Asset Proceeds

A simple mathematical calculation yields the proportion of the asset sale proceeds attributable to each tangible asset. Adding the leasehold value of $12,900,000 to the vessel value of $6,600,000 yields $19,500,000. Therefore, the proportion of the assets attributable to the terminal lien is 66.2% (12,900,000 ÷ 19,500,000) and to the vessels is 33.8% (6,600,000 ÷ 19,500,000).

The individual vessels proportionate share of the asset sale proceeds are:

CAROLINA $\frac{900,000}{6,600,000}$ x .338 = .046 = 4.6%

GUAYAMA     $\underline{1,900,000}$   x   .338 = .097 = 9.7%
HUMACAO     6,600,000                (each)
MAYAGUEZ

Since only $10,369,646.32 is available for the asset sale proceeds, each vessel can

be allocated proceeds of no more than:

| | | | | | | |
|---|---|---|---|---|---|---|
| CAROLINA | .046 | x | 10,369,646.32 | = | $477,003.71 |
| GUAYAMA | .097 | x | 10,369,646.32 | = | $1,005,855.60 |
| HUMACAO | | | | = | $1,005,855.60 |
| MAYAGUEZ | | | | = | $1,005,855.60 |

These are the amounts that should be attributed to the sale of these vessels.

19058164 v4

VI.    **CONCLUSION**

Trustee shall submit his further motion for distribution of the segregated funds after the Court has resolved the maritime lien and constructive trust issues herein.

For the reasons set forth above, the Trustee requests the Court enter orders:

(1)    denying and dismissing the maritime lien seamen's wage claims asserted by the seamen's unions, MEBA and ARA;

(2)    granting the Preferred Ship Mortgages as pled;

(3)    holding that there are insufficient maritime lienable assets to pay the maritime liens for necessaries because the proceeds are exhausted by higher ranking liens;

(4)    denying CSX's claims of lien or constructive trust and releasing the segregated $800,000 fund to the bankruptcy estate;

and for such other relief as shall be deemed appropriate.

DATED:    August  18, 2003
          Wilmington, Delaware

Respectfully submitted,

THE BAYARD FIRM

Charlene D. Davis (No. 2336)
Daniel K. Astin (No. 4068)
Anthony M. Saccullo (No. 4141)
222 Delaware Avenue, Suite 900
P.O. Box 25130
Wilmington, DE  19899
(302) 655-5000

-and-

19058164 v4