**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| IN RE: | ) Chapter 7 |
| | ) |
| MUMA SERVICES, INC. | ) |
| (f/k/a Murphy Marine | ) Case No. 01-926 (MFW) Through |
| Services, Inc.), et al., | ) Case No. 01-932 (MFW) And |
| | ) Case No. 01-935 (MFW) Through |
| Debtors. | ) Case No. 01-950 (MFW) |
| | ) |
| | ) |

## OPINION[1]

Before the Court is the task of resolving the validity and

priority of competing claims to approximately $10 million from

the sale of the assets of NPR, Inc. ("NPR"), one of the Debtors

in these jointly administered cases.  The claims include

preferred ship mortgages, seamen's wage claims, penalty wage

claims, personal injury claims, an artisan's possessory lien for

repairs, an interline constructive trust fund claim, and a claim

under section 522(b) to subordinate claims under the "equities of

the case" doctrine.  After trial and briefing, we determine the

priorities of the claims are as set forth in the attached Order.


I.   BACKGROUND

On March 21, 2001, Murphy Marine Services, Inc., and certain

---

[1]  This Opinion constitutes the findings of fact and
conclusions of law of the Court pursuant to Federal Rule of
Bankruptcy Procedure 7052, which is made applicable to contested
matters by Federal Rule of Bankruptcy Procedure 9014.

affiliates including NPR (collectively "the Debtors") filed
voluntary petitions for relief under chapter 11 of the Bankruptcy
Code.  The Debtors were in the shipping industry, where they
operated maritime facilities and provided integrated cargo
transportation and logistics management services.

On April 26, 2002, we authorized the sale of substantially
all of the assets of NPR, including certain leases, accounts
receivable, and four vessels: the M/V Carolina, M/V Guyama, M/V
Humacao and M/V Mayaguez.  The assets were sold free and clear of
all liens and encumbrances to Sea Star Line, LLC ("Sea Star").
The sale proceeds were used to repay the post-petition financing
obligations and related fees owed to Wells Fargo and to satisfy
unpaid wages, withholding taxes and other current obligations due
to employees.  The remaining sale proceeds (which currently total
in excess of $10 million) were deposited into segregated accounts
pending the Court's determination of the claims and liens
thereon.

On July 25, 2002, we granted the U.S. Trustee's Motion to
convert the Debtors' cases to chapter 7.  Charles A. Stanziale
("the Trustee") was appointed the trustee.  Subsequently, a
deadline was set for the Trustee and claimants asserting liens
against the NPR sale proceeds to file their claims.  A hearing to
consider the claims and respective priorities of the liens was
held on May 13, 2003.  Thereafter, briefs were submitted by the

2

Trustee and some of the claimants.  The matter is ripe for decision.


II.  JURISDICTION

This Court has jurisdiction over this core proceeding pursuant to 28 U.S.C. §§ 1334 & 157(b)(2)(A), (B), (K) & (O).


III.  DISCUSSION

Because the sale proceeds include proceeds from the sale of NPR's vessels,[2] we must determine the priority of claims to those proceeds under maritime law.

### A.    Maritime Liens Generally

"The federal maritime lien is a unique security device, serving the dual purpose of keeping ships moving in commerce while not allowing them to escape their debts by sailing away. The lien is a special property right in the vessel, arising in favor of the creditor by operation of law as security for a debt or claim." Equilease Corp. v. M/V Sampson, 793 F.2d 598, 602 (5th Cir. 1986) (citations omitted).  A maritime lien is grounded

---

[2]  The Trustee presented evidence that the portion of the purchase price attributable to the vessels is approximately $6.6 million.  This is disputed by some of the other claimants who assert that the value of the vessels (to which their maritime liens attach) is significantly more.  Because we conclude that the Bank Group (which has a lien on the vessels as well as all the other assets) is entitled to the bulk of the proceeds, we find it unnecessary to determine the precise value of the vessels.

in "the legal fiction that the ship itself caused the loss and may be called into court to make good." Ventura Packers, Inc. v. F/V Jeanine Kathleen, 305 F.3d 913, 919 (9th Cir. 2002). This "personifies a vessel as an entity with potential liabilities independent and apart from the personal liability of its owner," giving the maritime lien claimant the right to seize the vessel and have it sold to satisfy the debt owed. Equilease, 793 F.2d at 602 (citations omitted). See generally, Robert Force & Martin Norris, 1 The Law of Seamen § 20:3 (5th ed. 2004).

When a maritime lien attaches to a vessel, it accompanies the ship everywhere and through all transfers of ownership, even into the hands of a bona fide purchaser without notice, unless the transferee has acquired title through an in rem judicial proceeding that extinguishes the lien. See Michael J. Ende, Adrift on a Sea of Red Ink: the Status of Maritime Liens in Bankruptcy, 11 Fordham Int'l L.J. 573, 588 (1988) (arguing that bankruptcy courts, as courts with in rem jurisdiction over the debtor's assets, should have the power to sell vessels free and clear of maritime liens).

The perfection of a maritime lien does not require that a creditor record his lien, obtain possession of the vessel, or file a claim against the ship. See, e.g., Bermuda Express, N.V. v. M/V Litsa (Ex. Laurie U), 872 F.2d 554, 557-58 (3d Cir. 1989). Rather, the lien attaches and is perfected when the underlying

4

debt or claim arises.  See, e.g., Equilease, 793 F.2d at 603.
For these reasons, maritime liens are often characterized as
"secret liens" because third parties may have no notice that they
exist.  Id.  See also, Bermuda Express, 872 F.2d at 558.
Although maritime liens were created by common law, they have
largely been codified in the Commercial Instruments and Maritime
Lien Act ("the Maritime Lien Act").  See 46 U.S.C. §§ 30101-31343
(1989).

A preferred ship mortgage is not a maritime lien created by
common law; it is a creature of statute.  See, e.g., U.S. v.
Trident Crusader, 366 F.3d 391, 394 (5th Cir. 2004); Long Island
Tankers Corp. v. S.S. Kaimana, 265 F. Supp. 723, 725 (N.D. Cal.
1967) (preferred ship mortgages were created "to provide for the
promotion and maintenance of the American merchant marines. . .
to make private investment and credit in the shipping industry
more attractive and also to protect the United States as one of
the principal sources of credit for ship financing.").  A
preferred ship mortgage is not a secret lien and is perfected
only when filed in substantial compliance with the requirements
of the Maritime Lien Act.  46 U.S.C. § 31322(a)(3)(B).  See,
e.g., Prudential Ins. Co. of Am. v. S.S. American Lancer, 870
F.2d 867, 874 (2d Cir. 1989) (preferred ship mortgage was valid
where party attempted in good faith to perform all statutorily
required procedures to perfect the mortgage and subsequent lienor

had actual knowledge of clerical error).

The Maritime Lien Act provides that when a vessel is sold in
an in rem action by order of a court of competent jurisdiction
the maritime lien claims attach to the proceeds of the sale in
accordance with their priorities.  46 U.S.C. § 31326(a) & (b).
This is similar to the sale of property free of liens under
section 363 of the Bankruptcy Code.  11 U.S.C. § 363(f).  See
also, In re Trans World Airlines, Inc., 322 F.3d 283, 290-92 (3d
Cir. 2003) (holding that section 363(f) permits sale free and
clear of interests as well as traditional liens on property, with
such claims relegated to the proceeds of sale).

Generally, maritime liens must be satisfied before non-
maritime liens.  See, e.g., McAllister Towing v. Ambassador
Factors (In re Topgallant Lines, Inc.), 154 B.R. 368, 376 (S.D.
Ga. 1993).  Maritime liens are ranked first by class and then by
priority within each class.  All maritime liens of the same class
must be satisfied in full before payment can be made on any lien
of a lower class.  See, e.g., U.S. v. One (1) 254 Ft. Freighter,
the M/V Andoria, 570 F. Supp. 413, 415 (E.D. La. 1983) ("If the
funds are insufficient to pay the next lower ranked class in
full, the available funds will be distributed among claimants in
that class according to the rules operating within that class.")
Within a class, a maritime lien that arises later in time primes
earlier liens.  See, e.g., Gowen, Inc. v. F/V Quality One, 244

6

F.3d 64, 69 (1st Cir. 2001) ("among liens of 'equal rank,' later
liens have priority").

Preferred ship mortgages have priority over all claims
against the vessel, except expenses and fees imposed by the court
selling the vessel and preferred maritime liens.  46 U.S.C. §
31326(b)(1).  A preferred maritime lien is defined as

> a maritime lien on a vessel - (A) arising before a
> preferred mortgage was [duly] filed . . .; (B) for
> damage arising out of maritime tort; (C) for wages of a
> stevedore when employed directly by [an officer or
> agent of the vessel]; (D) for wages of the crew of the
> vessel; (E) for general average; or (F) for salvage.

46 U.S.C. § 31301(5)(A)-(F).

B.    <u>Priority of Claims in this Case</u>

1.    <u>Preferred ship mortgage liens</u>

Wachovia Bank, National Association, as agent for itself,
Fleet National Bank, Wilmington Trust Company of Pennsylvania and
MBC Leasing Corporation (collectively "the Bank Group") hold
first preferred ship mortgages on the NPR vessels.  The Trustee
has stipulated that the Bank Group claim totals approximately $62
million and concedes the validity of its first preferred ship
mortgages on the NPR vessels, as well as its liens on NPR's other
assets.  None of the other parties asserting claims dispute the
existence or amount of the Bank Group's claim.

The Bank Group's claim exceeds the amount of the proceeds
from the sale of the NPR assets.  Therefore, in order to receive
any recovery, the other claimants must establish that their

7

claims rank above those of the Bank Group.

### 2.  Maritime Tort Claims

Several claimants have personal injury claims which they assert are entitled to priority as maritime tort claims. Although we have no jurisdiction to liquidate personal injury claims,[3] the parties ask us to determine only whether their claims are entitled to preferred maritime lien status, ahead of the Bank Group's claims.  46 U.S.C. § 31301(5)(B).

### a.  Sarvello, Coney, Birch, Casper

On July 2, 2002, Robert Sarvello, Michael Coney, John Birch, and Francis Casper filed a joint notice of maritime liens for personal injuries they allegedly sustained while working on the NPR vessels.  Sarvello asserts a claim for injuries sustained aboard the M/V Guyama, where he worked as a longshoreman/lasher, while the vessel was moored to a pier in the Port of Greater Philadelphia.  Coney's claim is for injuries sustained while working as a longshoreman aboard the M/V Humacao.  Birch and Casper assert claims for injuries sustained while working as longshoremen on the M/V Mayaguez.

These claimants have executed a Stipulation with the Trustee lifting the automatic stay to allow them to liquidate their claims and recover from available insurance proceeds.  The Stipulation preserved their claims against the estate for any

---

[3]   28 U.S.C. § 157(b)(5).

portion not covered by insurance.  The claimants assert they are entitled to a maritime lien for those claims.  The Trustee disputes their status as anything other than unsecured claims. In the notice filed with the Court, Sarvello, Coney, Birch and Casper requested that we order the Trustee to place in escrow funds to satisfy any portion of their claims that applicable insurance policies do not cover, until their claims have been fully liquidated.

Maritime tort claims are entitled to a second priority under the Maritime Lien Act, with priority over preferred ship mortgages such as the Bank Group's.  See 46 U.S.C. §§ 31326(b)(1) & 31301(5)(B).  See also, Andoria, 570 F.Supp. at 415.  Seamen who are injured aboard a vessel may sue the ship owner for negligence under the Jones Act or may pursue a maritime tort claim against the vessel for unseaworthiness.  See, e.g., Miles v. Apex Marine Corp., 498 U.S. 19, 29 (1990).

However, longshoremen who are injured are precluded from suing a vessel for unseaworthiness.  Id. at 28 (citing the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. §§ 901-950 ("the LHWCA")).  Previously, where an injured longshoreman sued a vessel for unseaworthiness, the owner of the vessel often would seek indemnity from the longshoreman's employer, thereby resulting in the employer paying more than just workers' compensation.  As a result, the LHWCA was amended in 1972 to

9

eliminate the longshoreman's right to sue a vessel for

unseaworthiness (which has a strict liability standard).   To

compensate, the LHWCA increased the amount of workers'

compensation which is payable to injured longshoremen by their

employers and allowed the longshoremen to sue the vessel (or

vessel owner) for negligence.   See, e.g., Garris v. Norfolk

Shipbuilding & Drydock Corp., 210 F.3d 209, 221 (4th Cir. 2000);

Pittston Stevedoring Corp. v. Dellaventura, 544 F.2d 35, 39-40

(2d Cir. 1976); Griffith v. Wheeling-Pittsburgh Steel Corp., 521

F.2d 31, 40 (3d Cir. 1975).

   The LHWCA specifically provides that:

> In the event of injury to a person covered under this
> Act caused by the negligence of a vessel, then such
> person, or anyone otherwise entitled to recover damages
> by reason thereof, may bring an action against such
> vessel as a third party in accordance with the
> provisions of section 33 of this Act. . . .   The
> liability of the vessel under this subsection shall not
> be based upon the warranty of seaworthiness or a breach
> thereof at the time the injury occurred.   The remedy
> provided in this subsection shall be exclusive of all
> other remedies against the vessel except remedies
> available under this Act.

33 U.S.C. § 905(b).

   Consequently, we conclude that the longshoremen (to the

extent they are successful in establishing a claim for

negligence) would have maritime tort claims with priority over

the Bank Group's preferred ship mortgages on the relevant

vessels.   See 46 U.S.C. §§ 31326(b)(1) & 31301(5)(B).   See also,

Andoria, 570 F.Supp. at 415.

b.    Keenan and Haber

Two other claimants, Thomas Keenan and Edward Haber, filed objections to the NPR sale on April 16, 2002.  They both, apparently, assert unliquidated personal injury claims.  The Trustee's submissions suggested that stipulations for relief from the stay may be filed with respect to them as well; however, no further pleading has been filed.

To the extent that Keenan and Haber are seamen with personal injury claims that arose from injuries sustained onboard any of the NPR vessels, they would be entitled to maritime tort claims with priority over the Bank Group's claims.  Id.

c.    Bilbow

On July 2, 2002, Matthew Bilbow filed a notice of maritime lien for personal injuries he allegedly sustained at the Packer Avenue Terminal when he was struck by a motor vehicle operated by an employee of the M/V Humacao.  Bilbow asserts that the employee was acting within the scope of on-board employment and, therefore, asserts he has a maritime tort claim.  The Trustee stipulated to limited relief from the automatic stay to allow Bilbow to serve his Complaint; however, the Trustee denies that Bilbow has a maritime lien on the NPR sale proceeds.

After considering Bilbow's arguments, we agree with the Trustee's contention that Bilbow does not have a valid maritime tort claim which would be a lien on the sale proceeds from the

M/V Humacao.  Although Bilbow was employed by the Debtors as a
crane operator at the Packer Avenue Terminal, he was injured by a
private motor vehicle operated by one of the Debtor's other
employees.  No vessel was in any way connected with the injury.

Bilbow argues nonetheless that there is support for his
position that land-based injuries can give rise to personal
injury maritime liens.  See, e.g., Hopson v. Texaco, Inc., 383
U.S. 262 (1966); Reed v. S.S. Yaka, 373 U.S. 410 (1963);
Gutierrez v. Waterman S.S. Corp., 373 U.S. 206 (1963); Boudoin v.
Lykes Bros. S.S. Co., Inc., 348 U.S. 336 (1955).  The cases cited
are, however, distinguishable and, in some instances, no longer
good law.

The Reed and Gutierrez cases did conclude that longshoremen
may assert a maritime tort claim based on the unseaworthiness of
a vessel if they were injured by the actions of the vessel or her
crew.  373 U.S. at 414-15; 373 U.S. at 210.  However, it appears
that those cases are no longer valid precedent since longshoremen
are now precluded from suing a vessel for unseaworthiness and
are, instead, limited to claims for workers' compensation or
negligence.  See Apex Marine Corp., 498 U.S. at 28; 33 U.S.C. §§
901-950.

Further, comparing the instant facts with the facts of those
cases show further dissimilarities.  In Gutierrez, a longshoreman
was injured on land while unloading a vessel's cargo when he

12

slipped on beans which had spilled from the cargo onto the dock.
373 U.S. at 207.   The Supreme Court ruled that the plaintiff
could bring a maritime tort claim based on the unseaworthiness of
the vessel even though he was injured on land.   Id. at 210.   The
Court limited its ruling by stating that the "case is within the
maritime jurisdiction . . . when, as here, it is alleged that the
shipowner commits a tort while or before the ship is being
unloaded, and the impact of which is felt ashore at a time and
place not remote from the wrongful act."   Id.   The instant case
does not fit that description.   Bilbow was not injured by the M/V
Humacao, its cargo, or anyone in the act of loading or unloading
the cargo.   Therefore, he has no in rem claim against the vessel.

     The Hopson case also does not support Bilbow's cause.   In
Hopson, the Supreme Court ruled that a claim could be made under
the Jones Act for death and injury incurred when a taxi carrying
two sick seamen collided with a truck en route to the U.S.
Consul's office.   The Hopson Court held that, because there was a
statutory duty to deliver the seamen to the U.S. Consul, the
seamen were still in the service of the vessel when they were
injured.   383 U.S. at 264-65.   In this case, Bilbow was not a
seaman in service to any vessel and therefore his injuries on
land (which were not caused by any action of the vessel or its
unloading) cannot be considered a maritime tort claim.

     The Boudoin and Reed cases are similarly inapposite as they

involved claims of seamen for injuries caused by the vessel's
unseaworthiness.  Because Bilbow is a longshoreman he is
precluded from bringing any claim for unseaworthiness.  33 U.S.C.
§ 905(b).

Therefore, we conclude that Bilbow's claim for personal
injuries is not entitled to priority as a maritime tort claim or
to a lien against the proceeds of sale of the vessel.

### d.  Dixon

Stewart Dixon asserts a maritime tort claim for injuries
sustained while acting as a seaman on the M/V Carolina.  By Order
dated March 12, 2003, we disallowed Dixon's claim because he had
failed to file a timely proof of claim.[4]  We held that Rule
3002(c) of the Federal Rules of Bankruptcy Procedure precluded us
from enlarging the time to file proofs of claim in this chapter 7
case.  However, we lifted the automatic stay to allow Dixon to
prosecute his action in New York.

Dixon now requests that we reconsider the disallowance of
his claim for several reasons.  First, he argues that Rule
3002(c) would allow the Court to extend the time for filing a
proof of claim for an infant or an incompetent person in the
interests of justice if it would not unduly delay the
administration of the estate.  Fed. R. Bankr. P. 3002(c)(2).

---

[4]  Dixon sought additional time to file his claim, because
he did not receive notice of the bankruptcy filing or of the bar
date, being out of the country for an extended period of time.

14

Since Dixon is a Jones Act seaman, he is a ward of the Court
similar, he argues, to an infant or orphan.  See, e.g., The
Governor & Co. of the Bank of Scotland v. Sabay, 211 F.3d 261,
265-66 (5th Cir. 2000) ("no authority really need be cited for
the fact that seamen, the 'wards of admiralty,' historically have
received favored treatment from the Congress and the admiralty
courts.") (citations omitted).

We will grant Dixon's request that we reconsider our earlier
decision and will allow Dixon's maritime tort claim against the
sale proceeds of the M/V Carolina.  See, e.g., 11 U.S.C. § 502(j)
("a claim that has been . . . disallowed may be reconsidered for
cause . . . [and] may be allowed . . . according to the equities
of the case.").

Our reasoning, however, is somewhat different from that
argued by Dixon.  We reconsider our decision because a maritime
tort claim is a secured claim.  A secured claimant is not
required to file a proof of claim in a bankruptcy case because,
unless the lien is avoided, it passes through bankruptcy
unaffected.  See, e.g., Dewsnup v. Timm, 502 U.S. 410, 417 (1992)
(stating that the Court was "not convinced that Congress intended
to depart from the pre-Code rule that liens pass through
bankruptcy unaffected."); Johnson v. Home State Bank, 501 U.S.
78, 84 (1991) (holding that "a bankruptcy discharge extinguishes
only one mode of enforcing a claim - namely, an action against

15

the debtor _in personam_ - while leaving intact another - namely,
an action against the debtor _in_ _rem_.”); United Presidential Life
Ins. Co. v. Barker, 31 B.R. 145, 148 (N.D. Tex. 1983) (finding
that valid liens which have not been disallowed or avoided
survive bankruptcy discharge); Penco Corp. v. Andrews (In re
Andrews), 22 B.R. 623, 625-26 (Bankr. D. Del. 1982) (holding
that debtors' failure to act timely to avoid lien resulted in
lien surviving bankruptcy discharge).   Cf. In re Penrod, 50 F.3d
459, 462-63 (7th Cir. 1995) (concluding that chapter 11 plan of
reorganization can modify lien, force holder to accept
indubitable equivalent, or even extinguish lien).

Section 506(d) of the Bankruptcy Code specifically provides
that:

> To the extent that a lien secures a claim against the
> debtor that is not an allowed secured claim, such claim
> is void, unless -
>
> . . .
>
> (2) such claim is not an allowed secured
> claim due only to the failure of any entity
> to file a proof of such claim under section
> 501 of this title.

11 U.S.C. § 506(d).  In addition, section 522(c) provides that:

> property exempted under this section is not liable
> during or after the case for any debt of the debtor
> that arose . . . before the commencement of the case,
> except -
>
> . . .
>
> (2) a debt that is secured by a lien that is
> . . . not avoided under [applicable
> provisions of the Bankruptcy Code].

11 U.S.C. § 522(c).

Because Dixon's asserted maritime tort claim for personal injury against the M/V Humacao is a preferred maritime lien, that lien was not affected simply because Dixon failed to file a timely proof of claim. Consequently, Dixon's maritime tort claim stands on equal footing with the other maritime tort claims. To the extent that his claim is ultimately proven and liquidated, it has priority over the Bank Group's preferred ship mortgage. See 46 U.S.C. §§ 31326(b)(1) & 31301(5)(B). See also, Andoria, 570 F.Supp. at 415.

In addition, Dixon argues that, while we granted him relief from the stay with permission to proceed against insurance proceeds, the terms of the insurance policies make it impossible for him to obtain any recovery. The insurance policies are marine protection and indemnity policies which require that the Debtor actually pay the insured claims before the insurer is required to reimburse the Debtor. Thus, Dixon asserts that unless we order the estate to pay his claim, he cannot recover under the insurance policies.

There is authority, however, that would preclude the insurance carriers from requiring the estate to pay the claimants before they can recover from the insurance carriers. See, e.g., Home Ins. Co. of Ill. v. Hooper, 294 Ill. App. 3d 626, 632 (Ill. App. Ct. 1998) (holding that insurance policy provision which required actual payment of self-insured retention by insolvent

17

insured before insurance carrier was obligated to pay damages violated public policy). However, the Trustee has stipulated with other personal injury claimants that he will pay the claims simultaneously with the payment to him from the insurance carriers. (See Stipulation dated May 8, 2003, at paragraph 4.) Consequently, we will require that the Trustee do the same with respect to Dixon's claim. There is no prejudice to the estate (or to the other claimants' position in the proceeds) by this procedure because the Trustee will be able to recover the insurance proceeds (less the deductibles) and distribute them to the other claimants with maritime liens on the sale proceeds.

### 3. Seaman's Wages

No individual seaman has filed a claim for unpaid wages.[5] However, the Marine Engineers Beneficial Association, AFL-CIO ("MEBA") and the American Radio Association ("ARA") (collectively "the Unions") ask this Court to recognize their claims (in excess of $13 million) for dismissal compensation for their members as a maritime lien for seamen's wages.

The Unions represented workers on three of the four NPR vessels, the M/V Humacao, M/V Guyama and M/V Mayaguez. They claim that these workers are due dismissal wages pursuant to

---

[5]    The Trustee previously settled the claims of the Masters, Mates and Pilots union ("MM&P") for unpaid wages due for the period immediately prior to closing on the sale. Pursuant to that stipulation, the Trustee has paid $95,600 for the MM&P maritime lien wage claim and MM&P has reserved the right to assert the balance of its claim as an administrative claim.

their collective bargaining agreements, which provide, in

relevant part:

> (e)(1) In order to preserve the jobs of the Company's
> [workers] covered by the Agreement, the Company agrees
> that should any vessel . . . be sold or transferred . .
> . to another entity (excluding the Federal Government)
> for operation under U.S. Flag . . . the vessel shall be
> sold or transferred with the full complement of
> [workers] last employed on said vessel . . . .
> (2) In order to protect and maintain the wages, pension
> rights, other economic benefits and conditions of such
> [workers], and to prevent their immediate discharge by
> the buyer or transferee thereby frustrating the
> preservation of their job rights, the Company . . .
> will obtain from the purchaser or transferee a written
> agreement providing:
> (a) that the purchaser or transferee shall
> immediately upon sale or transfer employ the [workers]
> last employed on said vessel, and thereafter shall not
> terminate such [workers] without just cause; and
> (b) that for the life of the vessel the purchaser
> or transferee will provide such [workers] with wages,
> pension benefits, and other economic benefits and
> conditions . . . at least equal to that which would
> have been enjoyed had such [workers] continued
> employment on the vessel by the Company.
>                              . . . .
> (g)(2) In the event that the Company fails to secure
> the written agreement required by subsections (e) or
> (f) above, the Company shall be liable to the [Union]
> in the sum certain amount equal to the total employment
> costs of a full complement of [workers] on each
> involved vessel for a period of three years. Such sum
> shall be distributed by the [Union] to the [workers]
> injured by the Company's breach and shall not be
> reduced by the interim earnings of such [workers] or
> for any other reason.

(MEBA Exh. 1 at § 41. See also MEBA Exh. 2, 6, & 7.)

The Unions assert maritime lien status for the dismissal

wages due under the agreements. See, e.g., Gayner v. The New

Orleans, 54 F. Supp. 25, 27-28 (N.D. Cal. 1944) (recognizing

19

maritime lien status for dismissal wages due for loss of
expectation of future employment).  Both the Trustee and the Bank
Group dispute the maritime lien status of the Unions' claims.
See, e.g., Sabay, 211 F.3d at 275-76 (holding that penalty wages
are due from the vessel owner, not the vessel, and therefore are
not maritime lien claims entitled to priority over preferred ship
mortgage).

We conclude that the Unions' claims are not entitled to
preferred maritime lien status as seaman's wages.  First, the
Unions have no claim for dismissal wages under their Agreements
because, after the vessels were sold, Sea Star continued to
employ all Union workers (the engineers and the radioman) then
serving on the vessels. (Transcript at 64, 113.)  Sea Star later
scrapped the M/V Humacao and the M/V Guyama in the Far East and
sold the M/V Mayaguez to CSX Lines (which is now known as Horizon
Lines).  Horizon continued to employ these same workers under the
collective bargaining agreement it had with the Unions.

The Unions argue, nonetheless, that dismissal wages are due
because NPR breached the Agreements by not getting Sea Star to
guarantee in writing the workers' employment for the life of the
vessels.  While this may be a technical breach of the Agreements,
the workers have suffered no damages as a result of that breach.
Sea Star did, in fact, continue to employ them until the vessels
were scrapped and their maritime lives ended or until the vessel

was sold again.  In the latter case, although Sea Star also did
not get the written commitment of Horizon to employ the crew
represented by the Unions, Horizon did in fact continue to employ
the crew under its own collective bargaining agreement with the
Unions.  Therefore, we conclude that the seamen have suffered no
injuries for which dismissal wages would be due.

Further, even if the crew members had not continued to be
employed on those vessels, we would conclude that the Unions'
claims are not entitled to preferred maritime lien status.  To
qualify as a preferred maritime lien for seaman's wages, the
claim must be for wages due to a specific seaman for services
rendered on a specific vessel.  See, e.g., Citibank, N.A. v. The
Vessel American Maine, 865 F.2d 24, 27 (2d Cir. 1988) ("The
hallmark of a wage lien is that the wage owed to a seaman has
accrued by virtue of his service to a particular ship."); Bender
Welding & Mach. Co., Inc. v. M/V Sovereign Opal, 415 F. Supp.
772, 774 (S.D. Ala 1976) (calculating maritime lien wages based
on the amount of time individual seamen had served on the vessels
and allowed them directly to those seamen); Gayner, 54 F. Supp.
at 26, 29 (noting that claims were asserted by seamen directly
and concluding that trial must be held on question of what
services were rendered to vessel for which dismissal wages were
due).

The collective bargaining agreements in this case state that

dismissal wages are to be paid to the Unions, not to the individual workers. The Unions argue that the agreements also require that the funds received be distributed by the Unions to the seamen "injured by the Company's breach" and, therefore, the funds at issue really are wages due to the seamen.

However, the claims asserted represent not specific wages, but instead is the hypothetical cost to the vessels to operate for three years in the future. Unlike the Gayner case, on which the Unions rely, the dismissal wages here are not calculated by the length of time that any individual seaman served on the vessels. 54 F.Supp. at 26.

In addition, there is no specific seaman identified as being entitled to any specific wages. Although the Unions did provide a list of the Union members who were the last to serve on the vessels before the sale (MEBA Exh. 4), they conceded that those seamen were not necessarily the ones entitled to be paid. (Transcript at 68-69.) The crew were assigned to the vessels under the Unions' procedures. Although some crew members were "permanent," they did not serve the vessels for the entire year but rather shared the service with others. (Id. at 48, 58-60, 87, 121-22.) Non-permanent positions were supplied from the union hall on a rotating basis among its members. (Id. at 60.) Therefore, the Unions' representatives were unable to identify how much, if anything, any specific seaman would be paid. Thus,

the Unions' claims do not qualify as a preferred maritime lien for seaman's wages.

Further, almost $7 million of the Unions' claims do not represent wages, but Union benefits. (MEBA Exh. 5 & 10.) Courts have consistently refused to grant preferred maritime lien status to contributions due to unions and their benefit funds, even though they are based on services performed by seamen and even though seamen may be beneficiaries of those funds. See, e.g., American Maine, 865 F.2d at 27-28 (holding that MEBA union trust fund benefits are not wages entitled to preferred maritime lien status); West Winds, Inc. v. M.V. Resolute, 720 F.2d 1097, 1099-1100 (9th Cir. 1983) (finding that contributions to union benefit funds were not wages entitled to maritime lien status); Long Island Tankers, 265 F. Supp. at 727 (holding that claims of union trusts for vacation, pension and welfare benefits were not preferred maritime liens for seamen's wages).

Therefore, we find that the Unions have not demonstrated that their claim for dismissal wages are seamen's wages that are entitled to preferred maritime lien status. Consequently, their claim is subordinate to the Bank Group's preferred ship mortgages. Since the sale proceeds fall short of satisfying the mortgages in full, the Unions cannot recover from the proceeds of the sale of the NPR vessels.

23

4.  Necessaries

S.C. Engineering ("SC") alleged a maritime lien for necessaries against the M/V Mayaguez totaling $67,759 for equipment repairs.  In response to the Trustee's objections, SC has reduced its claim for necessaries to $30,688 for repairs to equipment from the M/V Mayaguez alone.[6]  At the hearing, SC advised that it was still in possession of the equipment because it could not be determined if that equipment had been sold to Sea Star.  It was agreed that the parties would review the asset purchase agreement to answer that question.  Apparently, SC now concedes that the equipment was sold because it has turned over the equipment to Sea Star's assignee, Horizon, and seeks only a claim against the proceeds of the sale to Sea Star.

SC asserts a claim for necessaries for the repairs to the equipment.  See, e.g., 46 U.S.C. § 31301 (4) ("'necessaries' includes repairs, supplies, towage, and the use of a dry dock or marine railway"); Equilease, 793 F.2d at 603 ("The term 'necessary' under the [statute] includes most goods or services that are useful to the vessel, keep her out of danger, and enable her to perform her particular function.  Necessaries are the things that a prudent owner would provide to enable a ship to perform well the functions for which she has been engaged.") (citation omitted).

---

[6]  The remainder of the claim represents repairs SC made to equipment from another vessel not involved in this controversy.

24

Even though SC may have a claim for necessaries for its repair of equipment from the M/V Mayaguez, that does not result in it being entitled to payment ahead of the Bank Group. Claims for necessaries do not rank ahead of preferred ship mortgages. 46 U.S.C. § 31326. See also, Andoria, 570 F.Supp. at 415 (holding that, traditionally, liens for necessaries have had maritime lien status that ranks below preferred ship mortgages). No claims for necessaries will be paid from the proceeds of the vessels because the Bank Group's preferred ship mortgages are superior and will consume all the proceeds.

The vast majority of the other claims filed are also for maritime liens for "necessaries" supplied to the NPR vessels. Because there will be no funds left after payment on the preferred ship mortgages, we need not address those claims.

B.    Non-maritime Claims

Several claimants assert claims against the proceeds of the sale of NPR's assets (other than the vessels) under non-maritime theories as well.

1.    The Bank Group

The Bank Group asserts a blanket security interest in all the assets of NPR, including the accounts receivable, leases and miscellaneous other assets. As noted, the Trustee concedes the validity and perfection of its liens. Other claimants assert, nonetheless, that their non-maritime claims should prime the Bank

25

Group's claim.

> ### 2.  S.C. Engineering

The Bank Group anticipated that SC might assert a common law artisan's lien on the equipment it repaired.  The Bank Group argues, however, that any such claim would also be subordinate to its preferred ship mortgages.

A common law possessory lien attaches to equipment which is repaired by the claimant and still in its possession.  See, e.g., Beck v. Nutrodynamics, Inc., 186 A.2d 715, 716 (Essex County Ct. 1962) ("a workman who by his skill and labor has enhanced the value of a chattel. . . has a lien on the chattel for his reasonable charge.") (quoting O'Brien v. Buxton, 156 A. 17, 18 (Monmouth County Ct. 1931)).

Even if SC had a valid possessory lien against the equipment, however, we conclude that it still could not recover funds in satisfaction thereof.  The Bank Group's preferred ship mortgage against the vessel specifically encumbers the pump and motor assembly.  (See Wachovia Exh. 7 at 2.)  Consequently, the Bank Group's preferred ship mortgage against the M/V Mayaguez is superior to any common law possessory lien against the equipment which SC might have.  See, e.g., Gary Aircraft Corp. v. General Dynamics Corp., 681 F.2d 365, 372 (5th Cir. 1982) ("The preferred mortgage prevails over common law possessory liens, such as a mechanic's lien.") (citations omitted).

3.    <u>CSX</u>

CSX Intermodal, Inc., and CSX Transportation Inc.
(collectively "CSX") assert that the Debtors hold approximately
$800,000 of proceeds from the sale of NPR's accounts receivable
which should be paid to them.   CSX alleges that these funds are
payment by NPR customers for shipments handled by CSX.

Pre-petition, NPR and CSX executed an Intermodal
Transportation Agreement ("the Agreement").   Pursuant to the
Agreement, NPR provided ocean carriage of cargo for its customers
in conjunction with CSX which provided inland transportation.
NPR transmitted shipping instructions electronically to CSX.   NPR
would transport the cargo to the port in Jacksonville, Florida,
and CSX would pick it up and move it to the final destination
over CSX or another railroad's lines.   In the latter case, CSX
would arrange for the transport and pay the other railroad from
its own funds.   NPR would later pay CSX for all railroad costs
(whether shipped on CSX lines or other railroads' lines).   CSX
provided NPR with weekly summary paper bills, which were always
reconciled and paid within 25 days.

a.    <u>Constructive trust</u>

CSX asserts that they have a constructive trust claim on the
accounts receivable of NPR representing payments for the cargo
they shipped, based primarily on the interline lien doctrine.
That doctrine provides that where goods are shipped in interstate

commerce via several carriers, the carrier which collects payment from the customer (typically the originating or destination carrier) holds the payment in trust for all the other carriers involved in the transport. See, e.g., In re Penn Central Transp. Co., 486 F.2d 519, 533 (3d Cir. 1973). See also, Parker Motor Freight, Inc. v. Fifth Third Bank, 116 F.3d 1137, 1142 (6th Cir. 1997) (applying interline trust doctrine to motor carriers); The Official Comm. of Unsecured Creditors v. Columbia Gas Systems, Inc. (In re Columbia Gas Systems, Inc.), 997 F.2d 1039, 1066-67 (3d Cir. 1993) (applying interline trust doctrine to natural gas pipeline providers). Consequently, CSX argues that the accounts receivable are not property of the Debtors' estate to which the lien of the Bank Group could attach.

The Trustee and the Bank Group disagree. They argue that the requirements necessary for the Court to construe a trust on the sale proceeds have not been satisfied. They contend further that, even if CSX could demonstrate that the conditions for a constructive trust have been met, CSX still could not receive the funds it seeks because it has failed to identify and trace them.

In Penn Central, the Court found that the carriers had manifested an intent to designate their relationship as one of trustee-beneficiary. 486 F.2d at 524. However, where parties have not expressly designated a trust, the Court identified six factors relevant to determine whether a constructive trust exists

28

(as opposed to a debtor-creditor relationship).  While no single factor is determinative, a trust is imposed if, in the aggregate, the following factors predominate: (1) there is no provision for payment of interest by the collecting carrier; (2) the collecting carrier does not commingle monies due to the other carrier with its general funds; (3) the carriers agree to apportion payments collected; (4) the amount the collecting carrier owes the other carrier directly relates to and depends upon the overall charge to the customer; (5) the collecting carrier must pay the other carrier only if the customer has paid it; and (6) the collecting carrier must pay the other carrier immediately upon settlement of the account, so that there is no "credit accommodation" for untimely payments.  Id. at 524-27.

In the instant case, there was no requirement that NPR pay interest to CSX on the monies collected from customers on their behalf – either under the Agreement or by custom.  This is indicative of a trust relationship.

Second, NPR did not earmark monies due to CSX, but rather commingled all collected revenues into a general fund from which it paid CSX and others.  Mr. Crawford from CSX admitted as much, testifying that NPR "was our customer . . . [and] we issued a freight bill to them and they paid us out of their funds." (Transcript at 161.)  This suggests a debtor-creditor relationship, rather than a trust.

29

Third, there was no arrangement between NPR and CSX to apportion payments collected from the customers.  Mr. Crawford conceded that the Agreement did not require that NPR collect money from its customers and apportion it between CSX and NPR for their services.  (Transcript at 167.)  This does not satisfy a crucial element for imposing a trust and instead suggests a debtor-creditor relationship.

Fourth, the amount NPR owed CSX did not relate to, or depend on, the overall charge to the customer.  In fact, the Agreement fixed the rate CSX charged NPR, independent of any charges paid by the customer.  (Agreement at § 5.1.)  Under cross-examination, Mr. Crawford conceded that the rates CSX charged NPR were based on volume rather than the rates NPR charged its customers.  (Id. at § 6.1; Transcript at 167.)  This implies a debtor-creditor relationship.

Fifth, NPR was liable to CSX even if the customer did not pay.  Although the Agreement authorized CSX to collect directly from delinquent customers that had not paid NPR for services provided by CSX, that did "not, in any way, discharge or modify [NPR]'s obligations" thereunder.  (Agreement at § 8.3.)  Thus, the written agreement between the parties evidences a debtor-creditor relationship.

Sixth, the Agreement called for NPR to pay CSX within 15 days from the invoice date and refers to these payments due as an

"extension of terms/credit."  (Id. at § 8.1.)  Moreover, the
Agreement requires that NPR "remain in good credit standing as
determined by [CSX], throughout the term of this Agreement."
(Id. at § 7.)  This evidences a debtor-creditor relationship
between the parties.

Therefore, applying the Penn Central factors, we conclude
that the relationship between NPR and CSX was one of debtor-
creditor, not one of trustee-beneficiary.

b.  Equities of the Case Doctrine

CSX requests, in the alternative, that we find under the
"equities of the case" that the Bank Group's pre-petition secured
claims should not be allowed to attach to receivables created
post-petition through the efforts of CSX.  CSX asserts that the
services they provided to NPR post-petition created the value
that allowed the sale proceeds to exceed the amount of Wells
Fargo's DIP loan, thus leaving money for further distribution to
creditors.  Consequently, CSX argues they should be reimbursed
before the pre-petition claims of the Bank Group are satisfied.

CSX relies on several cases which interpret section
552(b)(1) of the Bankruptcy Code.  That section provides:

> Except as provided in sections 363, 506(c), 522, 544,
> 545, 547, and 548 of this title, if the debtor and an
> entity entered into a security agreement before the
> commencement of the case and if the security interest
> created by such security agreement extends to property
> of the debtor acquired before the commencement of the
> case and to proceeds, product, offspring, or profits of
> such property, then such security interest extends to

31

such proceeds, product, offspring, or profits acquired
by the estate after the commencement of the case to the
extent provided by such security agreement and by
applicable nonbankruptcy law, <u>except to any extent that
the court, after notice and a hearing and based on the
equities of the case, orders otherwise</u>.

11 U.S.C. § 552(b)(1) (emphasis added). <u>See e.g.</u>, <u>United Va.
Bank v. Slab Fork Coal Co.</u>, 784 F.2d 1188, 1191 (4th Cir. 1986)
(holding that equities of the case may allow bankruptcy court to
cut off pre-petition security interest in post-petition
proceeds); <u>In re Patio & Porch Systems, Inc.</u>, 194 B.R. 569, 575
(Bankr. D. Md. 1996) ("This 'equities of the case' provision is
intended to prevent secured creditors from receiving windfalls
and to allow bankruptcy courts broad discretion in balancing the
interests of secured creditors against the general policy of the
Bankruptcy Code, which favors giving debtors a 'fresh start'.");
<u>In re Photo Promotion Assocs., Inc.</u>, 61 B.R. 936, 940 (Bankr.
S.D.N.Y. 1986) ("The equities in this case reveal that the
postpetition proceeds from the processed portraits should not be
turned over to [the bank] and should remain property of the
estate for all the unsecured creditors."); <u>In re Crouch</u>, 51 B.R.
331, 332 (Bankr. D. Or. 1985) ("The purpose behind the 'equities
of the case' rule . . . is, in a proper case, to enable those who
contribute to the production of proceeds during chapter 11 to
share jointly with pre-petition creditors secured by proceeds.").

The Bank Group and the Trustee disagree with the position
taken by CSX. They deny that the equities of this case warrant

32

changing the rule established by section 552(b)(1) that the Bank
Group's liens will extend to post-petition proceeds.  The Bank
Group asserts that "Courts generally limit the application of
this exception to Chapter 11 cases in which evidence establishes
that the lender is over secured, and will obtain a windfall 'from
collateral that has appreciated in value as a result of the
trustee's/debtor-in-possession's use of other assets of the
estate (which normally would go to general creditors) to cause
the appreciated value'."  In re Tower Air, Inc., 2002 Bankr.
LEXIS 102 at *11 (Bankr. D. Del. Feb. 11, 2002) (quoting
Delbridge v. Prod. Credit Ass'n, 104 B.R. 824, 826 (E.D. Mich.
1989)).  In this case, the Bank Group asserts it is not over-
secured and there is no evidence that the Trustee used other
assets of the estate which would have gone to administrative
claimants like CSX to increase the value of the Bank Group's
collateral.  To the contrary, the Debtors and Trustee in this
case used cash collateral of the Bank Group to pay, inter alia,
CSX.  The Bank Group notes, in particular, that CSX received $1
million post-petition on account of their pre-petition claims as
critical vendors of the Debtors.  Thus, the Bank Group asserts
there is nothing in the equities of this case which would warrant
ignoring the mandate of section 552(b)(1) that it be paid the
proceeds of its collateral.

    We agree with the contention of the Bank Group.  This is not

the type of case which warrants application of the "equities of

the case doctrine." As the Delbridge Court noted:

> The purpose of the equity exception is to prevent
> a secured creditor from reaping benefits from
> collateral that has appreciated in value as a result of
> the trustee's/debtor-in-possession's use of other
> assets of the estate (which normally would go to
> general creditors) to cause the appreciated value.  S.
> Rep. No. 989, 95th Cong., 2d Sess. 91, reprinted in
> 1978 U.S. Code Cong. & Admin. News 5787, 5877).  For
> example, if a creditor had a security interest in raw
> materials worth one million dollars and the debtor
> invested $100,000 from the general estate funds to
> convert those materials into a manufactured good worth
> 1.5 million dollars, it may be inequitable to let the
> secured creditor benefit from the entire proceeds of
> the sale, since the general creditors contributed to
> the appreciated value.

104 B.R. at 826.

In this case, neither the Debtors nor the Trustee invested

any unencumbered funds available to the general unsecured

creditors to enhance the value of the assets which were sold to

Sea Star.  On the contrary, since all assets were the security of

the Bank Group, it was only through the use of the Bank Group's

cash collateral (and the financing provided by Wells Fargo) that

the estate was able to continue to operate and maintain the value

of the assets.  Wells Fargo has been paid from the proceeds of

the NPR sale.  The equities of this case do not support further

eroding the Bank Group's collateral position under section

552(b)(1).

The cases cited by CSX are distinguishable from this case.

In two of the cases, while acknowledging the equities of the case

doctrine, the courts deferred deciding the issue until a factual
presentation could be made.  Slab Fork, 784 F.2d at 1191
(remanding for consideration by bankruptcy court); Patio & Porch,
194 B.R. at 575 (scheduling evidentiary hearing to consider
evidence of identification of proceeds of security interest and
equities of the case).  In Photo Promotion, the trustee had
borrowed additional funds in order to complete the work in
process that constituted the collateral of the pre-petition
lender.  61 B.R. at 939.  The Photo Promotion Court concluded
that, in the absence of completion, the collateral had minimal
value.  Id.

In Crouch, the Court articulated a test to determine whether
creditors of the estate who provided services post-petition would
be entitled to share in the proceeds of a secured creditor's
collateral.  51 B.R. at 333.  In doing so, it considered those
creditors who would have a section 506(c) claim against the
collateral for preserving it.  Id. at 332.  However, since the
ruling in Crouch, the Supreme Court has determined that creditors
do not have standing under section 506(c) to assert a claim for
preserving a secured creditor's collateral.  Hartford
Underwriters Ins. Co. v. Union Planters Bank, N.A., 530 U.S. 1,
14 (2000) ("We conclude that 11 U.S.C. § 506(c) does not provide
an administrative claimant an independent right to use the
section to seek payment of its claim.").  In this case, the

Trustee has already waived any section 506(c) claims which the estate may have against the Bank Group.

Consequently, we conclude that CSX has failed to establish that the "equities of the case" warrant subordination of the Bank Group's preferred ship mortgages to CSX's claims.


IV.   CONCLUSION

Therefore, based upon the foregoing, we conclude that only the personal injury claimants with maritime tort claims have priority over the Bank Group's preferred ship mortgages.  The claims of MEBA, ARA, SC, CSX, and all the other claims for "necessaries" are not entitled to priority over the Bank Group's claims.

An appropriate Order is attached.


                                   BY THE COURT:


Dated: March 30, 2005

                                   Mary F. Walrath
                                   United States Bankruptcy Judge