IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| MUMA MARINE SERVICES, INC. | ) | Case No. 01-926 |
| et al., | ) | through 01-950 (MWF) |
| | ) | |
| _____Debtors._____ | ) | |
| | ) | |
| MATTHEW BILBOW, | ) | |
| | ) | |
| Appellant, | ) | |
| v. | ) | Case No. 05-00328 (SLR) |
| | ) | |
| CHARLES A. STANZIALE, JR., | ) | |
| CHAPTER 7 TRUSTEE FOR | ) | |
| MUMA SERVICES, INC., et al., | ) | |
| | ) | |
| _____Appellee._____ | ) | |

## CHAPTER 7 TRUSTEE'S ANSWERING BRIEF

THE BAYARD FIRM
Charlene D. Davis (DE I.D. 2336)
Daniel K. Astin (DE I.D. 4086)
222 Delaware Avenue
Suite 900
P.O. Box 25130
Wilmington, DE 19899

WATSON FARLEY & WILLIAMS (NEW YORK) LLP
Alfred E. Yudes, Jr. (N.Y. I.D. AY 4152)
100 Park Avenue, 31st Floor
New York, NY 10017
Tel: (212) 922-2211
Fax: (212) 922-1512

Dated: October 28, 2005

Counsel for Appellee, Charles A.
Stanziale, Jr., Chapter 7 Trustee for
MUMA Marine Services, Inc.

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................ ii

STATEMENT OF APPELLATE JURISDICTION ............................................................ 1

STATEMENT OF ISSUES AND APPLICABLE   STANDARD  AND
SCOPE OF REVIEW ........................................................................................................ 2

NATURE AND STATE OF THE PROCEEDING .............................................................. 3

STATEMENT OF FACTS .................................................................................................. 5

ARGUMENT ....................................................................................................................... 7

    I.     THE PREVAILING LAW EMPHATICALLY SUPPORTS
           THE  BANKRUPTCY  COURT  CONCLUSION  THAT
           LONGSHOREMAN  BILBOW  DOEs  NOT  HAVE  A
           MARITIME LIEN ....................................................................................... 7

    II.    THERE   IS   NO   FACTUAL   PREDICATE   FOR
           APPELLANT'S LEGAL POSITION ........................................................ 10

CONCLUSION ................................................................................................................... 13

605624v4605624v4

i

# TABLE OF AUTHORITIES

Cases

*Boudin v. Lykes Brothers Steamship Co. Inc.,*
    348 U.S. 336 (1955).......................................................................................... 9

*Cesare v. Cole,*
    210 A.2d 491 (Pa. Supr. 1965) ...................................................................... 12

*Guiterriz v. Waterman S. S. Corp.,*
    373 U.S. 205 (1963)........................................................................................ 8

*Hopson v. Texaco Inc.,*
    383 U.S. 262 (1966)........................................................................................ 8

*In re Oakwood Homes Corp.,*
    329 B.R. 19 (D.Del. 2005)............................................................................. 2

*In re Peregrine Systems, Inc.,*
    2005 WL 2401955 (D.Del.)........................................................................... 2

*United States v. M/V ANDORIA,*
    570 F. Supp. 413 (E.D. La. 1983)................................................................. 5

*Victory Carriers Inc. v. Law,*
    404 U.S. 202 (1971)................................................................................. 9, 10

*Wilson v. United States,*
    315 F. Supp. 1197 (E. D. Pa. 1970)............................................................ 13

Statutes

28 U.S.C. § 157(b) ............................................................................................. 1

28 U.S.C. § 158(a) ............................................................................................. 1

33 U.S.C. §§ 901-950 ........................................................................................ 6

## STATEMENT OF APPELLATE JURISDICTION

This is an appeal from an Order of the Bankruptcy Court disallowing Matthew Bilbow's claim that his alleged personal injuries give rise to a maritime tort claim or to a lien against the proceeds of the sale of a vessel.  The Bankruptcy Court had jurisdiction over the core matter pursuant to title 28 United States Code section 157(b).  This Court has jurisdiction over the appeal pursuant to title 28 United States Code section 158(a).

## STATEMENT OF ISSUES AND APPLICABLE STANDARD AND SCOPE OF REVIEW

ISSUE:

   1.  Whether the Bankruptcy Court Properly Applied Governing Legal Precedent to Conclude that Appellant Does Not Have a Maritime Lien.

   In undertaking a review of this issue, the District Court applies a clearly erroneous standard to the Bankruptcy Court's findings of fact and a plenary standard to its legal conclusions. *In re Peregrine Systems, Inc.,* 2005 WL 2401955 (D.Del.) *1; *In re Oakwood Homes Corp.*, 329 B.R. 19, 22 (D.Del. 2005).Where the issue implicates mixed questions of fact and law, the District Court must accept the Bankruptcy Court's findings of historical facts unless they are clearly erroneous, but exercises plenary review of the Bankruptcy Court's choice and interpretation of legal precepts and the application of those precepts to historical facts. *Id.*

ISSUE:

   2.  Whether the Bankruptcy Court Properly Concluded on the Facts That Appellant Does Not Have a Maritime Lien on Appeal.

   In undertaking a review of this issue, the District Court applies a clearly erroneous standard to the Bankruptcy Court's findings of fact and a plenary standard to its legal conclusions. *In re Peregrine Systems, Inc.,* 2005 WL 2401955 (D.Del.) *1; *In re Oakwood Homes Corp.*, 329 B.R. 19, 22 (D.Del. 2005).Where the issue implicates mixed questions of fact and law, the District Court must accept the Bankruptcy Court's findings of historical facts unless they are clearly erroneous, but exercises plenary review of the Bankruptcy Court's choice and interpretation of legal precepts and the application of those precepts to historical facts. *Id.*

605624v4605624v4

2

## NATURE AND STATE OF THE PROCEEDING

On April 26, 2002, the Bankruptcy Court entered an Order approving the Sale of NPR Assets Free and Clear of All Liens, Claims and Encumbrances.  NPR's principal assets were four (4) U.S. flag vessels and terminal leases in Puerto Rico, along with miscellaneous cargo handling equipment, trucks, office equipment and accounts receivable.  The sale proceeds amounted to about $28,124,455.97.  NPR is one of the Debtors in the above administratively consolidated Chapter 7 cases (the "April 26 Order").  Charles A. Stanziale, Jr. is the Chapter 7 trustee (the "Trustee").

Pursuant to the April 26, 2002 Order, the Court required that the proceeds from the asset sale be segregated until the proper allocation was determined.  In particular, the Court set deadlines for the assertion of maritime lien claims that would have attached to the vessels and that would then be asserted against the proceeds of sale of the vessels.

Maritime lien claims were asserted for seaman's wages and for personal injuries. Some alleged personal injuries were to seamen who served onboard the vessels and other alleged injuries were to longshoremen who worked on the ships, or on the piers, to facilitate the cargo loading or unloading process.

Five (5) longshoremen asserted maritime lien claims in the bankruptcy case.  Four (4) longshoremen alleged that their injuries occurred while working onboard a specific ship during loading or discharging operations.  The fifth, Appellant Matthew Bilbow ("Bilbow"), was allegedly injured on February 25, 2000 after operating a crane on a pier (not onboard a vessel) when he was struck by a motor vehicle operated by an NPR employee.  Bilbow alleges that this employee was (i) a crewman onboard the NPR vessel M/V HUMACAO, and (ii) was engaged on the business of the vessel at the time of the accident.  Both assertions, even if relevant, are inaccurate.

605624v4605624v4

3

On May 13, 2003, the Bankruptcy Court held hearings on the validity and priority of the alleged maritime lien claims. That hearing resulted in an Order and Opinion of the Bankruptcy Court which, *inter alia*, denied Appellant's maritime lien claim (the "March 30, 2005 Order").

In the March 30, 2005 Order and Opinion, Judge Walrath held that to the extent they are successful in establishing a claim against the shipowner, the four longshoremen who were injured onboard vessels would have maritime tort lien claims with priority over the Banks' ship mortgages (Opinion at p. 10). In regard to Bilbow (Opinion pp. 11-14), the Court held that "Bilbow does not have a valid maritime lien claim." (Opinion p. 11.) The Court found that Bilbow was employed by Debtors as a crane operator on the pier, but that he was injured by "a private motor vehicle operated by one of the Debtor's other employees" (Opinion at p. 12). Significantly, the Court held that "no vessel was in any way connected with the injury." (Opinion at p. 12).

The Court went on to distinguish the cases cited by Appellant in support of his claim of maritime lien, and correctly concluded that there was no legal authority in support of a claimed maritime lien for this automobile accident.

On April 8, 2005, Bilbow filed a notice of appeal from the March 30, 2005 Order. On September 29, 2005, Bilbow filed the Opening Brief of Appellant Matthew Bilbow (the "Opening Brief"). This is the Trustee's brief in response to the Opening Brief.

## STATEMENT OF FACTS

Bilbow alleges that on or about February 25, 2000, he was injured while on a pier at the Packer Avenue Terminal in Philadelphia, Pennsylvania when he was struck by a motor vehicle operated by a crew member of the M/V Humaco-a vessel owned and operated by NPR. He also alleges that he was a longshoreman at the time.

Following the Bankruptcy Court's entry of the April 26, 2002 Order authorizing the sale of NPR's assets with liens attaching to proceeds, Bilbow timely filed an Amended Notice asserting a maritime lien claim against the sale proceeds based upon the injuries he maintains he sustained as a result of the February 25, 2000 incident..

The secured lenders, led by Wachovia, hold first preferred ship mortgage maritime liens on each vessel that far exceed the total proceeds of all the NPR assets that were sold.[1] Therefore, only those maritime liens with priority over the Banks' mortgages will benefit from the proceeds of sale. The priority of liens is as follows:

  (a)   costs of administration during the custodia legis period;
  (b)   seamen's wages;
  (c)   salvage and general average
  (d)   tort liens, including personal injury and death;
  (e)   pre-mortgage maritime liens for necessaries;
  (f)   preferred ship mortgage.

*See, United States v. M/V ANDORIA,* 570 F. Supp. 413 (E.D. La. 1983)

A seaman injured onboard a vessel is entitled to maintenance and cure, i.e. living expenses and medical expenses while being treated, and lost wages from his employer, the shipowner. These are payable regardless of any shipowner liability as a form of

---

[1] Of the proceeds of sale, it is the Trustee's view that at most only $6.6 million is attributable to the four (4) vessels in the following amounts: CAROLINA - $900,000; GUAYAMA, HUMACAO and MAYGUEZ - $1.9 million each.

605624v4605624v4

workmen's compensation. Additionally, a shipowner is obligated to furnish a seaworthy vessel upon which the seamen is employed. Where a seaman establishes that the injury resulted from an unseaworthy condition of the vessel, or negligence attributable to the shipowner, the seaman has an action for the injuries caused, which gives rise to a maritime lien against the vessel.

A longshoreman, who provides the shore based labor to load and discharge vessels, has his rights set out in the Longshoremen and Harbor Workers Compensation Act, 33 U.S.C. §§ 901-950 ("LHWCA" or "The Act"). The Act entitles him to workmen's compensation benefits from his employer, the stevedore company, regardless of fault. When injured onboard a vessel, a longshoreman may proceed against the shipowner and the ship *in rem*, but only where the injury results from negligence attributable to the shipowner. There is no seaworthiness obligation due to a longshoreman, actual negligence is required.

In the March 30, 2005 Order, the Court found that Bilbow was employed by Debtors as a crane operator on the pier, but that he was injured by "a private motor vehicle operated by one of the Debtor's other employees. (Opinion at p. 12) The Court also determined that "no vessel was in any way connected with the injury." (Opinion at 12). Ultimately, the Court concluded that "Bilbow's claim for personal injuries is not entitled to priority as a maritime tort claim or to a lien against the proceeds of the sale of the vessel." (Opinion at p. 14).

605624v4605624v4

## **ARGUMENT**

### I.    THE    PREVAILING    LAW    EMPHATICALLY    SUPPORTS    THE BANKRUPTCY    COURT    CONCLUSION    THAT    LONGSHOREMAN BILBOW DOES NOT HAVE A MARITIME LIEN

Appellant argues that an injury inflicted on land by a private automobile driven by (it is alleged) a crewman from M/V HUMACAO in the scope of his employment creates a vicarious liability on the vessel (not the vessel owner) *in rem* giving rise to a maritime lien.[2] Appellant then cites no authority for this unique proposition.

Rather, Appellant cites to one longshoreman case that is completely distinguishable from the case at issue, and was based upon the Longshoreman and Harbor Worker's Compensation Act before it was revised in 1972 to eliminate any vessel owner's seaworthiness obligation to a longshoreman [which was the basis for liability].

Then, Appellant intersperses a number of seaman cases, where the Owner and vessel owed a seaworthiness and certain statutory obligations to the seaman, that are not obligations to a longshoreman, and cavalierly references these as sufficiently similar to be analogous (use of Cf. signal). These cannot be analogous where the liabilities being examined arise under different statutes that create entirely different bases for liability and different obligations.

In fact, Appellant also cites a longshoreman case as supportive of its proposition where out of five (5) factors referred to by that Court in denying a maritime lien, only one of the five is vaguely similar to this case and the other four (4) clearly contradict Appellant's argument.

---

[2]        As will be shown in Section 2 hereof, the factual predicate of this argument is lacking since the tortfeasor was (i) not a crewman and (ii) not acting in the scope of his employment at the time of the accident.

605624v4605624v4

In *Guiterriz v. Waterman S. S. Corp.*, 373 U.S. 205 (1963), under the LHWCA prior to the 1972 amendments, the Court concluded that a longshoreman could assert a maritime lien based on the <u>unseaworthiness</u> of the vessel if injured by the acts of the vessel or its crew. *Id.* at 210. In the first instance this case is no longer valid precedent because the 1972 Amendment to the LHWCA eliminated a longshoreman's ability to sue a vessel for unseaworthiness.

Further, in *Guiterriz* the longshoreman was on land, but engaged in unloading cargo from the vessel. He slipped on beans that had spilled from the cargo being unloaded from the vessel and onto the dock. *Id.* at 207. The Supreme Court allowed the longshoreman to pursue a maritime tort claim based on unseaworthiness where the allegation was that the shipowner committed a tort during the unloading of the vessel that caused the beans to be on the dock and that the impact of that tort was felt ashore at a time and place not remote from the wrongful act. *Id.* At 210.

But, Bilbow claims he had been operating a crane on the pier, had climbed down to the pier, was walking on the dock and was struck by a private vehicle that had nothing to do with loading or unloading a ship. *Guiterriz*, even if still valid precedent, would not support a maritime lien claim in these circumstances.

Appellant's citation to *Hopson v. Texaco Inc.*, 383 U.S. 262 (1966) is inapposite. Hopson was a seaman, the case was under the Jones Act not the LHWCA and the injury ashore occurred to the seaman while the shipowner was fulfilling its statutory obligation to repatriate a sick seaman from a foreign port to his home. The Court held that the seamen were still in the service of the vessel when the taxi they were riding in to the U.S. Consul's office was struck by a truck. 383 U.S. at 264-5. Bilbow is not a seaman, and is not owed such a statutory duty by the shipowner.

*Boudin v. Lykes Brothers Steamship Co. Inc.*, 348 U.S. 336 (1955) is again a seaman's case, where plaintiff seaman could purse a maritime lien claim based on the <u>unseaworthiness</u> of the vessel when he was assaulted by another seaman with known violent tendencies.

Appellant's citation to Benedicts *On Admiralty* is disingenuous. It states the obvious but is here inapplicable. Benedicts' proposition cited by Appellant is that a shipowner is vicariously liable for the negligence of its employees acting within the scope of their job. It does not say that the vessel is liable *in rem*, or that a maritime lien is created.

In *Victory Carriers Inc. v. Law*, 404 U.S. 202 (1971) where the longshoreman was injured by a forklift on the dock the Court held there was <u>no maritime jurisdiction</u> (so no maritime lien). That Court cited (at least) five factors that indicated the typical elements of a maritime claim were missing:

    (i)    the forklift was not part of ship's gear;

    (ii)   it was not stored onboard the ship;

    (iii)  it was in no way attached to the ship;

    (iv)  it was not under the control of the ship or its crew, and

    (v)   the accident did not occur onboard the ship or its gangplank.

*Id.*

Here (i) through (iii) and (v) clearly are against Appellant having a maritime lien. The private automobile, and location of the injury, are similar to or even more attenuated than the same as the forklift on the pier. Appellant argues, without any evidentiary support, that the automobile was operated by a crewmember, the error in which argument will be made clear in Section 2. But, even if operated by a crewmember, which is denied,

the private automobile had nothing to do with loading or unloading the vessel, it was merely the crewman's transportation to his next employment.

Therefore, the weight of the factors cited in *Victory Carriers* is against Appellant having a maritime lien to secure it.

## II.     THERE IS NO FACTUAL PREDICATE FOR APPELLANT'S LEGAL POSITION

Appellant pleads that he be given "...the same opportunity the other longshoremen were provided to have his case heard before a court with competent jurisdiction to liquidate his claim." (Appellant's Brief at 5). The fact is, he can liquidate his claim - but he does not have a maritime lien to secure it.

Each of the other four (4) longshoreman to whom Appellant refers were injured onboard a ship during loading or unloading operations. As the Bankruptcy Court noted, they have a prima facie claim to a maritime lien if they establish liability.

Appellant, on the other hand, was injured on-shore, by a private automobile and not during any loading or unloading activities. Even under Appellant's discredited legal proposition, he must establish that (i) the driver of the offending motor vehicle was a crewman in HUMACAO and (ii) the crewman was acting on ship's business, i.e. within the scope of his employment. Appellant cannot so prove because neither factual predicate is true.

On May 13, 2003, the Bankruptcy Court held hearings to establish the validity and priority of maritime lien claims. Appellant, Bilbow, had filed, at first, an unsecured claim against Debtors and did not seek to assert a maritime lien claim.

605624v4605624v4

10

Subsequently, Appellant submitted an amended claim asserting a maritime lien. In order to establish the validity and priority of his asserted maritime lien, Appellant admits he needed to show that the miscreant automobile driver was part of the ship's crew on ship's business. At the May 13th hearing, he submitted no such evidence. (TR 198). The Bankruptcy Court rejected Appellant's legal theory, so ignored the fact that Appellant failed to carry its burden of proving the factual predicate to his assertion of a maritime lien.

But, we now know that no such factual predicate exists. On June 6, 2003, Appellant's Philadelphia lawyer took the deposition of the driver of the automobile that struck Appellant, James P. Hannan. (Exhibit A, Deposition Transcript of James P. Hannan dated June 6, 2003). The deposition was taken in a Philadelphia County Common Pleas Court suit by Appellant and his wife against, *inter alia*, Mr. Hannan.

Under questioning by Appellant's counsel, Mr. Hannan testified that, having been on vacation, on the date of the accident he was driving his personal motor-vehicle from his home in Baltimore to the Packer Avenue Terminal where the accident occurred to report to HUMACAO and relieve the then serving Chief Engineer. (Exhibit A, pp. 11-12, 23-24). The accident occurred on the pier before Hannan reported to HUMACAO. After a police investigation of the accident he proceeded to board HUMACAO and was required to undergo a drug/alcohol test, which he failed for excessive blood alcohol levels. As a result, he was put off the vessel, which sailed without him, and he returned to Baltimore. (Exhibit A, p. 24, 28).

Mr. Hannan further testified that the Coast Guard initiated an investigation in relation to his failed blood alcohol test. However, since he was not employed as a crewman at the time of the accident nor at the time of the blood test no charges were brought against his license status by the Coast Guard. (Exhibit A, pp. 68-72).

605624v4605624v4

Therefore, at the time of the accident, he was not a crewman employed in HUMACAO and he was not acting within the scope of employment by the vessel. (Exhibit A, p. 12, 62)

In fact, no maritime lien can arise from a non-maritime tort.  There is no federal court admiralty jurisdiction over a car accident on the pier, which is governed by Pennsylvania state law.

Under Pennsylvania law, an employer is <u>not</u> liable for the negligence of his employee in driving the employee's car to or from work, or even between job sites. *Wilson v. United States*, 315 F. Supp. 1197, 1198 (E. D. Pa. 1970), *Cesare v. Cole*, 210 A.2d 491 (Pa. Supr. 1965).

## CONCLUSION

Appellant has submitted no legal authority to support the proposition that a longshoreman, not engaged in loading or unloading a vessel, struck by a private automobile, operated by an individual who intends to but has not yet reported for duty onboard a vessel, gives rise to a maritime lien.  Therefore, Judge Walrath's Order must be affirmed.

Respectfully submitted,

Charlene D. Davis (DE I.D. 2336)
Daniel K. Astin (DE I.D. 4086)
The Bayard Firm
222 Delaware Avenue
Suite 900
P.O. Box 25130
Wilmington, DE  19899
Telephone:  (302) 655-5000

and

Alfred E. Yudes, Jr., Esquire (N.Y. I.D. AY 4152)
Watson, Farley & Williams LLP
100 Park Avenue, 31st Floor
New York, NY  10017
Telephone:  (212) 922-2211

605624v4605624v4

Slip Copy

Slip Copy, 2005 WL 2401955 (D.Del.)

(Cite as: 2005 WL 2401955 (D.Del.))

**H**

Page 1

Motions, Pleadings and Filings

Only the Westlaw citation is currently available.

United States District Court,
D. Delaware.
In re: PEREGRINE SYSTEMS, INC., et al.,
Debtors.
AW TREUHAND GMBH
WIRTSCHAFTSPRUFUNGSGESELLSCHAFT
STEUERBERATUNGSGESELLSCHAFT,
formerly known as Arthur Andersen
Wirtschaftsprufungsgesellschaft
Steuerberatungsgesellschaft, Appellant,
v.
PEREGRINE SYSTEMS, INC., et al., Appellees.
No. 02-12740 (JFK), 02-12741(JKF), Civ.
04-1325-SLR.

Sept. 29, 2005.
Theodore J. Tacconelli, Ferry, Joseph & Pearce,
P.A., Wilmington, DE, for Appellant.

Kimberly E. Connolly Lawson, Reed Smith LLP,
Wilmington, DE, for Appellees.

MEMORANDUM ORDER

ROBINSON, J.

*1 At Wilmington this 29th day of September,
2005, having reviewed the papers submitted by the
parties to this appeal;

IT IS ORDERED that the opinion and order issued
on September 8, 2004 is affirmed in part and
reversed in part, and the matter is remanded to the
bankruptcy court for further proceedings consistent
with this order.

1. Standard of Review. This court has jurisdiction
to hear an appeal from the bankruptcy court
pursuant to 28 U.S.C. § 158(a). In undertaking a
review of the issues on appeal, the court applies a
clearly erroneous standard to the bankruptcy court's
findings of fact and a plenary standard to that
court's legal conclusions. See Am. Flint Glass
Workers Union v. Anchor Resolution Corp., 197
F.3d 76, 80 (3d Cir.1999). With mixed questions of
law and fact, the court must accept the bankruptcy
court's "finding of historical or narrative facts

unless clearly erroneous, but exercise[s] 'plenary
review of the [bankruptcy] court's choice and
interpretation of legal precepts and its application of
those precepts to the historical facts." ' Mellon
Bank, N.A. v. Metro Communications, Inc., 945
F.2d 635, 642 (3d Cir.1991) (citing Universal
Minerals, Inc. v. C.A. Hughes & Co., 669 F.2d 98,
101-02 (3d Cir.1981)). The district court's appellate
responsibilities are further informed by the directive
of the United States Court of Appeals for the Third
Circuit, which effectively reviews on a de novo
basis bankruptcy court opinions. In re Hechinger,
298 F.3d 219, 224 (3d Cir.2002); In re Telegroup,
281 F.3d 133, 136 (3d Cir.2002).

2. Background. On September 22, 2002, appellees
(hereinafter referred to collectively as "Peregrine")
filed a petition in the United States Bankruptcy
Court for the District of Delaware, seeking relief
under Chapter 11 of the Bankruptcy Code. The
following day, Peregrine filed a complaint in the
Superior Court of the State of California ("the
California Action"), asserting claims for
professional malpractice, fraud and breach of
contract against Arthur Andersen LLP ("Andersen
LLP"), Arthur Andersen Worldwide S.C., Daniel
Stulac, and appellant (as it was formerly known)
Arthur Andersen Wirtschaftsprufungsgesellschaft
Steuerberatungsgesellschaft mbH (hereinafter "AA
WPG"). Peregrine is a software company based in
San Diego, California. According to the California
complaint, Peregrine was audited by Andersen LLP
from 1997 until April 2002. AA WPG is a German
accounting company alleged to have provided
accounting services to Peregrine during the relevant
time period. Although AA WPG's relationship with
Andersen LLP vis a vis Peregrine has not been
established, there is no dispute that AA WPG has
never conducted business in the United States.

3. On December 19, 2002, AA WPG filed an
action in Germany against Peregrine, pursuant to §
256 of the German Code of Civil Procedure,
seeking a determination that it was not liable to
Peregrine in tort or in contract ("the German
Action"). On March 18, 2003, AA WPG brought a
motion in the bankruptcy court [FN1] seeking a
determination that the automatic stay provision of
11 U.S.C. § 362(a) did not apply to the German
Action. A hearing on the motion was held in May
2003, at which time the bankruptcy court denied

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

AA WPG's application for relief. In its May 28, 2003 order issued at the conclusion of the hearing, the bankruptcy court required that AA WPG obtain a suspension of the German Action "pending further order of this Bankruptcy Court." (D.I. 17 at A200, A248, A282)

> FN1. Throughout these proceedings, AA WPG has formally preserved its jurisdictional defenses and has never submitted itself to the claims process, either directly or indirectly.

*2 4. On June 13, 2003, AA WPG filed a motion for reconsideration, seeking approval of a voluntary stay or suspension of the German Action. The German Action was suspended in July 2003 and, according to the record submitted at bar, remains suspended to date. On June 16, 2003, Peregrine filed a motion for its costs, attorneys' fees and other sanctions under 11 U.S.C. § 362(h). On November 11, 2003, after confirmation of Peregrine's plan of reorganization in the bankruptcy court, AA WPG brought a motion for relief from the stay.

5. The bankruptcy court held a hearing on December 16, 2003 on all the pending motions. By an opinion and order dated September 8, 2004, the bankruptcy court denied AA WPG's motion for reconsideration (finding that the automatic stay was applicable to the German Action) and denied AA WPG's motion for relief from stay. The bankruptcy court held the German Action to be void ab initio and ordered AA WPG to "cause its German Action to be dismissed within 30 days hereof." Finally, the bankruptcy court granted Peregrine's motion for sanctions in the amount of $110,368.21. (D.I. 18 at A824-25) This appeal followed. [FN2]

> FN2. A stay of the bankruptcy court's order was granted on October 7, 2004. (D.I.9)

6. Analysis. The bankruptcy court came to several legal conclusions on its analytical journey to the order it entered. The first significant legal conclusion reached by the bankruptcy court was that the automatic stay provided for in 11 U.S.C. § 362(a) was applicable to the German Action. According to the reasoning of the bankruptcy court, [FN3] as understood by this judicial officer, because both the California and the German Actions are based on the alleged prepetition conduct of AA WPG, both Actions could have been filed prepetition. [FN4]

> FN3. This analysis is contained on pages A 804-A809 of D.I. 18.

> FN4. The bankruptcy court characterizes AA WPG as filing the German Action to "thwart" the California Action by obtaining "priority of service." Although the record indicates that, if service is accomplished in the California Action before it is accomplished in the German Action, AA WPG will lose the right to proceed with the German Action, it is not apparent to me that Peregrine will lose the right to proceed with the California Action if the reverse were true, i.e., if service were accomplished in the German Action before it is accomplished in the California Action. In other words, it is not clear how the California Action would be "thwarted" by the German Action.

7. Section 362 provides that any "judicial proceedings" commenced "against the debtor" that "could have been commenced before the commencement of the case under this title" are automatically stayed "until the bankruptcy case is closed, dismissed, or discharge is granted or denied, or until the bankruptcy court grants some relief from the stay." *Maritime Elec. Co., Inc. v. United Jersey Bank,* 959 F.2d 1194, 1206 (3d Cir.1991). The Third Circuit has held that the automatic stay applies to all actions brought against a debtor, even if the action does not constitute a claim against the debtor and even if the actions are not brought to obtain property of the estate, so long as "the outcome of the proceeding could conceivably have any effect on the estate being administered in bankruptcy." *Borman v. Raymark Industries, Inc.,* 946 F.2d 1031, 1036 (3d Cir.1991) (quoting *Pacor, Inc. v. Higgins,* 743 F.2d 984, 994 (3d Cir.1984)). The German Action, which is in the nature of a declaratory judgment action, is a judicial proceeding brought against Peregrine to determine whether AA WPG is responsible for any compensable injury to Peregrine. On the assumption (because it is not clear from the record) that any decision made by the German Court would affect the bankruptcy estate at bar, the German Action is "a judicial, administrative, or other action" under § 362(a).

*3 8. The next step of the analysis requires the court to determine whether AA WPG could have commenced the German Action before Peregrine filed its petition in bankruptcy. The bankruptcy

court concluded that AA WPG could have done so, based on the fact that Peregrine could have instituted the California Action prepetition; "[t]he fact that [Peregrine] brought suit postpetition does not change the prepetition nature of the action." (D.I. 18 at A807)

9. If AA WPG were seeking enforcement of a "claim" against Peregrine in the German Action, the above analysis could be correct, as a "claim" under 11 U.S.C. § 101(5)(A) means a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." [FN5] But AA WPG is not asserting a claim against Peregrine; it is asserting a defense to an action filed--postpetition--by Peregrine against AA WPG.

> FN5. *But see Matter of M. Frenville Co., Inc.,* 744 F.2d 332, 335 (3d Cir.1985), where the Third Circuit reasoned that prepetition conduct, in and of itself, is not sufficient to cause the automatic stay to apply; rather, one must look to see when the claim or cause of action arises.

10. Therefore, the question remains as to whether AA WPG could have legally asserted its defense in the German Action before Peregrine's claim against AA WPG was asserted in the California Action. As described by the bankruptcy court, a " § 256 ZPO action can be filed if and when a claim is asserted without any factual or legal basis" [FN6] in order to determine "the existence or nonexistence of a legal relationship ... in the event that the plaintiff has a legal interest in the immediate judicial determination of the legal relationship." [FN7] (D.I. 18 at A808) (emphasis added) The bankruptcy court did not specifically conclude that Peregrine's "claim" against AA WPG had been sufficiently "asserted" prepetition to give AA WPG "a legal interest in the immediate judicial determination of the legal relationship" between Peregrine and AA WPG. It simply concluded that AA WPG could have commenced the German Action prepetition because "the theory of relief is styled with respect to prepetition events that were known to the parties." (D.I. 18 at 808-09) With respect to the bankruptcy court's determination of knowledge, the court found that "Arthur Andersen was aware" of the facts underlying the California Action based on "press releases" which began some four months prior to Peregrine's petition date and the filing of

the California Action. (D.I. 18 at A806) (emphasis added)

> FN6. It is unclear whether the bankruptcy court is referring to the " § 256 ZPO action" or "the claim" that can be filed "without any factual or legal basis."

> FN7. The above language is akin to the standards used to determine whether a declaratory judgment action is ripe, i.e., whether it satisfies Article III's case or controversy requirement. In this regard, a court must "examine the 'adversity of the interest' between the parties to the action, the 'conclusiveness' of the declaratory judgment and the 'practical help, or utility' of the declaratory judgment." *Travelers Insurance Co. v. Obusek,* 72 F.3d 1148, 1154 (3d Cir.1995). This analysis was not undertaken by the bankruptcy court.

11. The record, as described in the opinion, does not establish that Peregrine's contingent, disputed claim filed postpetition against AA WPG provided a sufficient legal basis for AA WPG to assert a defense thereto by commencing--prepetition--a declaratory judgment action. Therefore, the bankruptcy court's conclusion that the German Action was subject to the automatic stay provision of § 362(a) is reversed.

12. Even if the German Action were subject to the automatic stay, § 362(d) provides that "the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay--(1) for cause...." (Emphasis added) The Bankruptcy Code does not define "cause"; rather, the courts must determine whether "cause" exists, based on the totality of the circumstances in each particular case. *See, e.g., In re Wilson,* 116 F.3d 87, 90 (3d Cir.1997). Courts will generally consider three factors in this regard: (1) the prejudice suffered by the debtor and debtor's estate if the stay is lifted to allow the continuation of a civil law suit; (2) the balancing of hardship between the parties; and (3) the probable success on the merits if the stay is lifted. *See In re Continental Airlines, Inc.,* 152 B.R. 420, 424 (D.Del.1993).

*4 13. The bankruptcy court concluded that AA WPG was not entitled to annulment of the stay, retroactive or otherwise. [FN8] With respect to its analysis under § 362(d), the court concluded that annulment of the stay would prejudice Peregrine, as it "would have to defend itself in a foreign country

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

and faces the risk of inconsistent judgments." (D.I. 18 at A810) In balancing the hardships, the bankruptcy court found that "AA WPG could refile the German Action if it withdrew it." [FN9] The court also found that AA WPG "may defend itself in the California Action and/or raise counterclaims there," while it would be a hardship for Peregrine to litigate the "same basic action in two fora" because of the risks of "inconsistent judgments" and the "inherent" inefficiencies and waste of resources. (D.I. 18 at A811) With respect to whether "retroactive" annulment was justified under the facts, the bankruptcy court basically ascribed bad faith to AA WPG, finding that AA WPG refused to dismiss or suspend the German Action and "inaccurately represented applicable German law to this court in seeking reconsideration;" AA WPG "did not seek relief from stay before it pursued its German Action;" "[i]ts German Action was intended and designed to obtain a procedural advantage and to thwart the California Action." (D.I. 18 at A814-15) Finally, the court found that the analysis of the Third Circuit in *Stonington Partners, Inc. v. Lernout & Hauspie Speech Products N.V.,* 310 F.3d 118 (3d Cir.2002), was inapplicable to the facts at bar.

> FN8. The bankruptcy court has two discussions of annulment under § 362(d)(1), one specifically addressed to "retroactive" annulment. It is not clear, however, how an annulment can be anything other than "retroactive" (i.e., annulment of the automatic stay, as opposed to simply terminating the stay, would serve to validate the proceedings that would otherwise be void *ab initio* ).

> FN9. This is so only if AA WPG is not served in the California Action before refiling in Germany.

14. Although the bankruptcy court's apparent frustration with AA WPG and its procedural posturing is understandable, nevertheless, the bankruptcy court's conclusions in this regard is at odds with the general principles espoused by the Court in *Stonington;* that is, for a bankruptcy court to enjoin a foreign proceeding, the foreign proceeding must implicate "important public polic[ies]" or "threaten United States jurisdiction in that it "attempt[s] to carve out exclusive jurisdiction over concurrent actions." *Id.* at 127. The Third Circuit specifically "concluded that neither duplication of issues nor delay in filing justifie[s] such an injunction, and further noted that even the fact that a foreign action was 'harassing and

vexatious' would not, by itself, warrant injunctive relief." *Id.*

15. Notwithstanding the bankruptcy court's assertion to the contrary (D.I. 18 at A817), the issue at bar has everything to do with jurisdiction, with comity, and with restraint. There is no "important public policy" at stake here; nor has it been established with any clarity that the German Action is "threaten [ing] United States jurisdiction." The record does not indicate that personal jurisdiction has been established either by the California court over AA WPG or by the German court over Peregrine. It is not clear what the scope of the German court's jurisdiction is and how that might affect the California Action. Indeed, the two courts actually involved in this dispute, in California and Germany, are in a much better position to make these difficult determinations than the bankruptcy court. Under these circumstances, the bankruptcy court's decision to enjoin the German Action is inconsistent with the restraint taught by the Third Circuit in *Stonington* and, consequently, is reversed.

*5 16. With respect to the bankruptcy court's award of sanctions against AA WPG, although the bankruptcy court's substantive conclusions have been reversed, nevertheless, I believe sanctions are appropriately levied in this case. The record indicates that AA WPG sought relief from the bankruptcy court and, when it did not get the relief it sought, declined to specifically follow the order of the court. The proceedings were made more difficult and expensive because of AA WPG's conduct, depleting Peregrine's estate needlessly. Therefore, the award of attorneys' fees and costs is an appropriate sanction for AA WPG's disrespectful, if not abusive, conduct in the bankruptcy court, pursuant to § 362(h). More specifically, however, the fees and costs associated with "defense of the German Action" (including the activity of German counsel) and with the initial motion and hearing are not appropriately awarded; the remaining fees and costs are.

Slip Copy, 2005 WL 2401955 (D.Del.)

Motions, Pleadings and Filings (Back to top)

.      1:04cv01325      (Docket) (Oct. 04, 2004)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

\*END\*END\*END\*END\*END\*END\*END\*END\*END\*END\*END\*END\*END\*END\*END\*END\*END\*END\*END\*

## 2764422 - DAVIS, CHARLENE

| | | |
|---|---|---|
| Date and Time Printing Started: | 10/28/2005 | 02:45:57 pm (Central) |
| Date and Time Printing Ended: | 10/28/2005 | 02:45:58 pm (Central) |
| Offline Transmission Time: | | 00:00:01 |
| Number of Requests in Group: | 1 | |
| Number of Lines Charged: | 293 | |

\*END\*END\*END\*END\*END\*END\*END\*END\*END\*END\*END\*END\*END\*END\*END\*END\*END\*END\*END\*