IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| MUMA MARINE SERVICES, INC. | ) | Case No. 01-926 |
| et al., | ) | through 01-950 (MWF) |
| | ) | |
| _____Debtors._____ | ) | |
| | ) | |
| MATTHEW BILBOW, | ) | |
| | ) | |
| Appellant, | ) | |
| v. | ) | Case No. 05-00328 (SLR) |
| | ) | |
| CHARLES A. STANZIALE, JR., | ) | |
| CHAPTER 7 TRUSTEE FOR | ) | |
| MUMA SERVICES, INC., et al., | ) | |
| | ) | |
| _____Appellee._____ | ) | |

## EXHIBIT A TO THE CHAPTER 7 TRUSTEE'S ANSWERING BRIEF

THE BAYARD FIRM
Charlene D. Davis (DE I.D. 2336)
Daniel K. Astin (DE I.D. 4068)
222 Delaware Avenue
Suite 900
P.O. Box 25130
Wilmington, DE 19899

WATSON FARLEY & WILLIAMS (NEW YORK) LLP
Alfred E. Yudes, Jr. (N.Y. I.D. AY 4152)
100 Park Avenue, 31st Floor
New York, NY 10017
Tel: (212) 922-2211
Fax: (212) 922-1512

Dated: November 1, 2005

Counsel for Appellee, Charles A.
Stanziale, Jr., Chapter 7 Trustee for
MUMA Marine Services, Inc.

James Patrick Hannan

1                   COURT OF COMMON PLEAS
              PHILADELPHIA COUNTY - LAW DIVISION
2                       —    —    —

MATTHEW BILBOW, JR. and          :DECEMBER TERM, 2001
3    MARIE BILBOW, his wife        :
                                   :
4                  Plaintiff(s)    :
                                   :
5              vs.                 :
                                   :
6    JAMES PATRICK HANNAN and      :
     ASTRO HOLDINGS, INC., a/k/a ASTRO:
7                                  :
                   Defendant(s)   :NO. 3210
8
                        —    —    —
9
                   Philadelphia, Pennsylvania
10                  Friday, June 6, 2003
11                      —    —    —
12            Oral deposition of JAMES PATRICK HANNAN,
13   taken pursuant to notice, held in the LAW OFFICES OF
14   GEROLAMO, McNULTY, DIVIS & LEWBART, 225 South 15th
15   Street, Suite 1600, on the above date, beginning at
16   approximately 11:24 a.m., before Robin A. Vance, a
17   Certified Shorthand Reporter and Notary Public for the
18   State of New Jersey and a Registered Professional
19   Reporter.
20
21                      —    —    —
22              Thomas G. Oakes Associates
                216 Haddon Avenue, Suite 400
23              Westmont, New Jersey 08080
                Telephone:  (856) 869-3433
24              Fax:  (856) 869-0612

92c3ea99-bb26-4a27-92fb-7355742b1c32

James Patrick Hannan

Page 2

```
 1    A P P E A R A N C E S:

 2

 3              FINE AND STAUD
                BY:  DAVID W. FINE, ESQUIRE
 4                   1333 Race Street
                     Philadelphia, Pennsylvania 19107

 5
                     Attorneys for the Plaintiff(s)
 6

 7

 8              GEROLAMO, McNULTY, DIVIS & LEWBART
                BY:  FRANK A. GEROLAMO, ESQUIRE
 9                   225 South 15th Street
                     The Lewis Tower Building, Suite 1600
10                   Philadelphia, Pennsylvania 19102

11                   Attorneys for the Defendant(s)

12

13    ALSO PRESENT:  Matthew Bilbow, Jr.

14

15

16

17

18

19

20

21

22

23

24
```

92c3ea99-bb26-4a27-92fb-7355742b1c32

James Patrick Hannan

Page 3

```
 1                    I N D E X

 2

 3    WITNESS                                    PAGE

 4    JAMES PATRICK HANNAN

 5

 6             BY MR. FINE                          4

 7

 8

 9

10

11

12                      -    -    -

13

14               HANNAN EXHIBITS

15

16    No.            DESCRIPTION              PAGE

17         (Whereupon no exhibits were marked.)

18

19                    -    -    -

20

21

22

23

24
```

James Patrick Hannan

1              (It is agreed by and between counsel that

2     certification and sealing are hereby waived; all

3     objections, except as to the form of the questions, are

4     reserved until the time of trial.)

5                    -   -   -

6              . . . JAMES PATRICK HANNAN, 1432 South

7     Hanover Street, Baltimore, Maryland 21230, having been

8     duly sworn, was examined and testified as follows:

9     BY MR. FINE:

10    Q.     Mr. Hannan, my name is David Fine.  I'm the

11    attorney for Matthew Bilbow and Marie Bilbow in this

12    case that was brought concerning an accident that

13    occurred on February 25th of 2000.  I want to ask you

14    some preliminary questions.

15             Have you ever been deposed before?

16    A.     I'm not certain.

17    Q.     Do you know what a deposition is?

18    A.     A statement of fact.

19    Q.     This is a deposition.  I'm going to be asking

20    you a series of questions related to the accident that

21    occurred on February 25th of 2000 and some surrounding

22    issues concerning that accident.

23             Have you ever been in a situation where you've

24    answered questions in a deposition setting before?

James Patrick Hannan

1                    MR. GEROLAMO: I think like this under

2    oath, Jimmy, with a court reporter.

3                    THE WITNESS: I was in federal court.

4    Under oath, I haven't.

5    BY MR. FINE:

6    Q.      Again, I am going to be asking you questions.  I

7    don't want you to guess at anything today.  If you don't

8    know something, I want you to tell me that.  If you want

9    me to repeat something, I'll do that.  If you need me to

10   clarify something, I will do that.

11              Are you under the influence of any alcohol or

12   drugs that would prevent you or that would impair your

13   ability to testify today?

14   A.      No.

15   Q.      Mr. Hannan, if you could just state your full

16   name for the record.

17   A.      James Patrick Matthew Hannan.

18   Q.      And, sir, what is your current address?

19   A.      Mailing address, 1432 South Hanover Street,

20   Baltimore, Maryland 21230.

21   Q.      How old are you?

22   A.      50.1.

23   Q.      What is your date of birth?

24   A.      April 2, '53.

James Patrick Hannan

Page 6

1    Q.       Can you tell me a little bit about your

2    educational background?

3    A.       High school and trade school and various

4    technical schools.

5    Q.       When did you graduate from high school?

6    A.       1971.

7    Q.       From where did you graduate high school?

8    A.       Levittown Memorial High School.

9    Q.       In what city or town is that?

10   A.       New York.  Long Island, New York.

11   Q.       You said you went to trade school after that?

12   A.       Yes.

13   Q.       What trade school did you go to?

14   A.       Calhoun Marine Engineering School, Baltimore,

15   Maryland.

16   Q.       How many years did you spend at Calhoun?

17   A.       Three years, five months, plus a week, five

18   days, five hours.

19   Q.       Did you leave there with a degree or a

20   certificate?

21   A.       An engineering license.

22   Q.       Have you had any technical or follow-up

23   education or training since then?

24   A.       Yes.

James Patrick Hannan

1    Q.      Can you briefly tell me about that?

2    A.      Most of it was home study.  Occasionally, I

3    would take a course at upgrading school to keep my

4    skills updated.

5    Q.      Are you currently married?

6    A.      No.

7    Q.      Have you ever been married?

8    A.      Yes.

9    Q.      How many times have you been married before?

10   A.      Once.

11   Q.      Do you have any children from that marriage?

12   A.      No.

13   Q.      Do you have any children?

14   A.      None at all.

15   Q.      Are you currently employed?

16   A.      No.

17   Q.      When was the last time you were employed?

18   A.      My last date of employment aboard a ship was

19   May 22, 2002.

20   Q.      Who was your employer as of May 22, 2002?

21   A.      That's a bit convoluted.

22   Q.      As best as you can explain it.

23   A.      The company I had been working for in excess of

24   20 years had been bankrupted and sold.

James Patrick Hannan

1    Q.       What was that company?

2    A.       The company was -- well, it's gone through a few

3    sales.  Initially, it was Navieres de Puerto Rico and

4    then became --

5    Q.       Was that ever referred to as NPR, Inc.?

6    A.       NPR, Inc., correct.

7    Q.       So by whatever name they were known as, you had

8    worked for Navieres line or NPR, Inc. for about 20

9    years, did you say?

10   A.       Since 1982, I believe.

11   Q.       Then what happened in 2002 that you no longer

12   were working for that company?

13   A.       The company dissolved, went bankrupt, and all

14   the ships were sold under a bankruptcy court order.

15   Q.       Have you sought any employment since then?

16   A.       Yes.

17   Q.       Have you had any employment since then?

18   A.       I've had some vacation time that was required by

19   the union, and as far as on-board ship time, none

20   whatsoever.

21   Q.       None that you've had or none that you've sought?

22   A.       None that I've had.

23   Q.       Have you been turned down for many jobs

24   recently?

James Patrick Hannan

1    A.       No.

2    Q.       Can you explain to me briefly, starting if you

3    go back 20 years ago in 1982, what you were hired to do

4    by Navieres or NPR and what your job duties were

5    throughout the course of your employment with them?

6    A.       1982 I was employed as a third assistant

7    engineer.  My duties were as a watch-standing engineer,

8    operate the machinery and maintain the parameters of the

9    vessel.

10   Q.       So that was in 1982?

11   A.       1982 through 2002.

12   Q.       So your job duties remained similar?

13   A.       Similar, but my grade increased in

14   responsibility.

15   Q.       And if you can just give me a little better

16   understanding, how often were you -- generally, how

17   often were you working and what was your time commitment

18   to them on a yearly basis?

19   A.       I worked, roughly, six months a year.

20   Q.       What was considered your place of employment?

21   A.       For the most part, it would be where the

22   headquarters were, where the ship was registered.  For

23   the longest time it was in New Jersey, and at one point,

24   it shifted to San Juan, Puerto Rico, and then it shifted

James Patrick Hannan

Page 10

1    to Delaware.  And all of these movements are vague to

2    me, unknown exactly when they transpired.

3    Q.        Now, again, to clarify, you say the reason why

4    you stopped working for NPR, Inc. in May of 2002 was

5    because they had filed for bankruptcy?

6    A.        They went bankrupt and sold all the vessels.

7    They no longer existed.

8    Q.        Are you going to be looking for any employment?

9    A.        I'm looking right now.

10   Q.        Now, I want to turn to -- there was an accident

11   that occurred on the Packer Avenue Terminal in

12   Philadelphia on February 25th of 2000.  Do you recall

13   that accident?

14   A.        Yes.

15   Q.        Are you familiar with the Packer Avenue

16   Terminal?

17   A.        Very much.

18   Q.        Throughout the course of your employment with

19   NPR, how many times would you say you had been on the

20   Packer Avenue Terminal?

21   A.        50.

22   Q.        From your recollection, I want you to describe

23   to me where on the Packer Avenue Terminal the accident

24   occurred.

James Patrick Hannan

Page 11

```
1    A.        We were roughly on the southern end of the

2    terminal.  The ship was docked on the southern end of

3    the terminal.

4    Q.        So it was near where the ship was docked?

5    A.        I was just inshore of the ship.

6    Q.        Do you remember the name of the ship?

7    A.        The SS Humacao, H-U-M-A-C-A-O.

8    Q.        So I want you to go ahead.  I had asked you

9    where on the pier the accident had occurred.

10   A.        I was driving north on the pier and was abreast

11   of the ship around noontime and after clearing the

12   aftermost crane, which was roughly abeam of the gangway,

13   I started to make a right-hand turn, and at that point

14   is when the pedestrian struck me.

15   Q.        The pedestrian struck you?

16   A.        Yes.

17   Q.        Who were you employed by at the time of the

18   accident?

19   A.        I was employed by no one at the time of the

20   accident.

21   Q.        What do you mean you were employed by no one?

22   A.        I was not on anybody's payroll.

23   Q.        So what were you doing on the pier?

24   A.        I was going to work.  I was scheduled to return.
```

James Patrick Hannan

Page 12

1   Q.     But your employer on the day of the accident,

2  was still NPR, Inc.?

3   A.     No, it was nobody.  It wasn't the union; it

4  wasn't the employer.  I was in limbo at the time.

5   Q.     What vehicle were you driving at the time of the

6  accident?

7   A.     A 1984 Toyota Cressida station wagon.

8   Q.     Who owned that car?

9   A.     Myself.  I did.

10   Q.     Nobody else?

11   A.     Nobody else.

12   Q.     Where were you driving at the time of the

13  accident?

14   A.     I was driving to the vessel.

15   Q.     From where were you coming at the time of the

16  accident?

17   A.     I was coming from Baltimore, Maryland.

18   Q.     Why were you driving your vehicle on the Packer

19  Avenue Terminal at the time of the accident?

20   A.     To facilitate getting my gear onto the ship.

21   Q.     So you were -- at the time of the accident you

22  were driving your vehicle toward the ship?

23   A.     Correct.

24   Q.     You said to facilitate getting your gear onto

James Patrick Hannan

Page 13

1    the ship?

2    A.        That's right.

3    Q.        What is your gear; how are you defining "gear"?

4    A.        Oh, lap top computer, work clothes, civilian

5    clothes.  And that pretty much sums it up.

6    Q.        So your gear consisted only of a lap top

7    computer, work clothes and civilian clothes?

8    A.        And a briefcase with appropriate documentation

9    in it.

10   Q.        What time were you supposed to be on board the

11   Humacao?

12   A.        No later than 1700 hours.

13   Q.        And for those of us who don't know military

14   time, what time is that?

15   A.        5:00 p.m.

16   Q.        And, again, what time did this accident occur?

17   A.        Noon, roughly.

18   Q.        I want you to describe, as best as you can,

19   again, the specific accident that we're discussing.

20   What occurred?

21   A.        Again, I was driving north on the terminal

22   inshore of the crane, which is abeam of the gangway.

23   Having passed the last crane leg, I proceeded to make a

24   right-hand turn towards the vessel and that's when the

James Patrick Hannan

1    pedestrian struck my vehicle.

2    Q.        Did he cause any harm to your vehicle?

3    A.        Yes, he put a dent in the left front wheel well,

4    the left front -- left side above the wheel, the fender,

5    and broke the mirror, the side-view mirror.

6    Q.        At the time that your vehicle and Mr. Bilbow

7    came into contact with each other, do you have an

8    understanding of your approximate speed?

9    A.        Five or ten miles an hour.

10   Q.        Do you have an understanding of what, if any,

11   speed limit exists on the Packer Avenue Terminal for

12   automobiles?

13   A.        My understanding would be 15 to 20 miles per

14   hour.

15   Q.        What is it that makes you recollect that you

16   were traveling five to ten miles per hour at the time of

17   the accident?

18   A.        I'm a cautious driver.

19   Q.        At the time of the accident, were you under the

20   influence of alcohol or drugs?

21   A.        No.

22   Q.        Prior to the accident, when did you last consume

23   any alcoholic beverage?

24   A.        Roughly, 18 to 20 hours, I guess.

James Patrick Hannan

Page 15

1   Q.      I'm not certain, do you remember why,

2   specifically, you remember having consumed alcohol 18 to

3   20 hours before?

4   A.      It was with dinner.

5   Q.      Where did you have dinner the night before the

6   accident?

7   A.      At home.

8   Q.      At home is referring to Baltimore?

9   A.      Baltimore, yes.

10                  MR. GEROLAMO:  Jimmy, regardless of

11  what the lawyers say, this young lady is the most

12  important person in the room.  So it's a lot easier for

13  her if you let him finish his question before you begin

14  your answer.

15                  THE WITNESS:  I'm sorry.

16                  MR. GEROLAMO:  That's all right.

17                  THE WITNESS:  I was just --

18                  MR. GEROLAMO:  I know.  I know you

19  want to get it done, but it's a lot easier on her

20  fingers and her psyche.

21  BY MR. FINE:

22  Q.      I believe you had testified that you estimate

23  you had been on the Packer Avenue pier approximately 50

24  times before this accident?

James Patrick Hannan

1    A.        That's correct.

2    Q.        How many times were you driving a motor vehicle

3    on the pier before this accident?

4    A.        I'm not sure what you're asking me.

5    Q.        How many times had you driven a motor vehicle on

6    the pier before this accident?

7    A.        That could be up to a hundred plus times on the

8    pier.

9    Q.        I'm a little confused.  If you said you had been

10   on the pier about 50 times before the accident, how is

11   it that you drove on the pier a hundred times before the

12   accident?

13   A.        Leaving the pier or coming back to the pier.

14   Q.        Okay.  How long before your vehicle came into

15   contact with Mr. Bilbow did you first see him?

16   A.        Forty-five seconds to one minute.

17   Q.        So you saw Mr. Bilbow, approximately, 45 seconds

18   to one minute before the accident occurred?

19   A.        To the best of my recollection.

20   Q.        Where were you looking immediately prior to the

21   accident?

22   A.        Immediately prior?

23   Q.        Correct.

24   A.        I was looking peripherally to the left, center,

James Patrick Hannan

Page 17

1    and to the right.

2    Q.      And when you saw Mr. Bilbow, approximately, 45

3    seconds to one minute before the accident, what was he

4    doing?

5    A.      He was walking north inshore of the cranes.

6    Q.      Walking north inshore of the cranes.  If you saw

7    him 45 seconds to a minute before the accident, how is

8    it that you still struck him?

9                    MR. GEROLAMO:  Objection to the form.

10   But you can answer the question, Jimmy, if you

11   understand it.

12                   MR. FINE:  I'll change the question.

13   BY MR. FINE:

14   Q.      If you saw him --

15                   MR. GEROLAMO:  He didn't say he

16   struck him.  He said your client struck his car.

17                   MR. FINE:  And that's why I'm

18   changing the question.

19   BY MR. FINE:

20   Q.      If you saw him 45 seconds to a minute before the

21   accident occurred, how is it that your vehicle came into

22   contact with Mr. Bilbow at the time of the accident?

23   A.      I don't know.

24   Q.      Was Mr. Bilbow running into your car?

James Patrick Hannan

Page 18

1   A.        I don't know.

2   Q.        But you remember 45 seconds to a minute before

3   the accident you saw him walking north on the pier?

4   A.        Correct.

5   Q.        Immediately prior to the accident, were you

6   listening to any music in your motor vehicle?

7   A.        No.

8   Q.        What is your understanding as to why your

9   vehicle came into contact with Mr. Bilbow at the time of

10  the accident?

11  A.        My understanding is that Mr. Bilbow ran into my

12  vehicle.

13  Q.        And I had just asked you before if Mr. Bilbow

14  had run into your vehicle and you said no.

15  A.        I don't recall that response.

16  Q.        At approximately what time on February 25th of

17  2000 did you gain access to the Packer Avenue Terminal?

18  A.        Repeat, please.

19                    MR. GEROLAMO:  You mean enter onto

20  the terminal property itself?

21                    MR. FINE:  Correct.

22  BY MR. FINE:

23  Q.        At, approximately, what time, on the day of the

24  accident, did you, along with your motor vehicle, enter

James Patrick Hannan

Page 20

1   A.      I believe procedure was for a phone call to be

2   made to the guard giving him some advance notice of my

3   arrival.

4   Q.      Did you make that call?

5   A.      I did not make that call.

6   Q.      Who would have called the guard to give advance

7   notice of your arrival?

8                    MR. GEROLAMO:  Objection to the form.

9   Go ahead, you can answer.

10                   THE WITNESS:  Any number of people.

11  BY MR. FINE:

12  Q.      Who may have called?

13  A.      Anyone of the employees for NPR at the time.

14  Q.      So then from your understanding the normal

15  protocol is that an NPR employee would have called the

16  front guard and told the front guard that you were going

17  to be coming to the pier and that they needed to give

18  you access to get onto the pier?

19                   MR. GEROLAMO:  Objection to the form.

20  Go ahead.

21                   THE WITNESS:  That's correct.

22  BY MR. FINE:

23  Q.      Why were you driving your personal vehicle as

24  opposed to a vehicle owned by your employer at the time

James Patrick Hannan

Page 21

1    of the accident?

2                        MR. GEROLAMO:  Objection to the form.

3    Go ahead.

4                        THE WITNESS:  I didn't have access to

5    a company vehicle.

6    BY MR. FINE:

7    Q.       You did not have access to a company vehicle?

8    A.       No.

9    Q.       Immediately prior to this accident that we've

10   been discussing, had you been aboard the Humacao?

11   A.       No.

12   Q.       All right.  We had discussed before and you said

13   you had -- the purpose for you driving your vehicle

14   toward the Humacao at the time of the accident, I

15   believe you said was to drop off some of your tools?  I

16   don't know how you described it, but drop off some

17   equipment or tools; is that correct?

18   A.       "Gear" was the word.

19   Q.       Gear, okay.  And you had stated that you dropped

20   off work clothes, civilian clothes and a lap top?

21   A.       I had not dropped off.

22   Q.       You stated that that was the purpose for why you

23   were driving toward the ship; is that correct?

24   A.       That is correct.

James Patrick Hannan

1   Q.      Was there any other equipment or tools that you
2   would have been utilizing on board the ship that you had
3   with you in the car?
4   A.      No.
5   Q.      Prior to the day of the accident, had you
6   dropped off any personal belongings or
7   employment-related articles or tools on board the ship?
8   A.      No.
9   Q.      How long was the journey to be aboard the
10  Humacao on that specific date?
11  A.      I don't understand the question.
12  Q.      My understanding is that you were --
13                  MR. GEROLAMO:  That presupposes that
14  he was going to go to sea with the ship.
15  BY MR. FINE:
16  Q.      What was your purpose for dropping off your
17  tools onto the Humacao prior to the accident?
18  A.      I was going to act as chief engineer on the ship
19  for the next six or eight weeks.
20  Q.      Do you know the route or where the ship was
21  going?
22  A.      It was varied.
23  Q.      Do you have any understanding of that specific
24  ship at that specific time, where it was supposed to be

James Patrick Hannan

Page 23

1    going?

2    A.      At that specific time, it was heading from

3    Philadelphia to San Juan, Puerto Rico.

4    Q.      And, again, you were going to be aboard that

5    ship for six to eight weeks, you said?

6    A.      Yes.

7    Q.      And in exactly what capacity, what were you

8    going to be doing aboard that ship?

9    A.      Be the chief engineer.

10   Q.      And to the best of your recollection, I want you

11   to set forth your work schedule from February 20th of

12   2000 through March 1st of 2000, if you remember.  So

13   February 20th would have been five days before this

14   accident.  March 1st would have been five days after the

15   accident or approximately five days after the accident.

16   A.      Five days prior to the accident I was on

17   vacation.  Five days after the date of the accident I

18   was to be employed as chief engineer on the SS Humacao.

19   Q.      Were you?

20   A.      I was not.

21   Q.      Why not?

22   A.      I was relieved of my duties by the --

23   Q.      What?

24   A.      I was relieved of my duties by the company.

James Patrick Hannan

1    Q.      By NPR, Inc.?

2    A.      This is correct.

3    Q.      Why were you relieved of your duties by NPR,

4    Inc.?

5    A.      Well, after the accident, it was standard

6    procedure to test all involved on the waterfront for

7    breath alcohol and drugs and whatever.

8    Q.      Did that test occur?

9    A.      That test occurred.

10   Q.      Do you have an understanding as to the results

11   of that test?

12   A.      The result was I was above the limit.

13   Q.      Above the limit of what for what?

14   A.      Above the Coast Guard's mandated zero tolerance

15   limit.

16   Q.      For alcohol?

17   A.      Correct.

18   Q.      How long after the accident were you tested for

19   alcohol?

20   A.      Four hours plus, roughly.

21   Q.      So, approximately, four hours after the accident

22   you were tested for alcohol?

23   A.      Correct.

24   Q.      At that point in time, you were -- it was found

James Patrick Hannan

Page 25

1   that you were above the limit pursuant to the Coast

2   Guard regulations?

3   A.      Correct.

4   Q.      Did you have any discussion or conversation with

5   the individual that you were involved in the accident

6   with after the accident?

7   A.      I knelt over him to see just what his condition

8   was and to, perhaps, assist.  Help came rather quickly

9   and that was the extent of it.

10  Q.      Did you say anything to him or did he say

11  anything to you after the accident?

12  A.      I think I was trying to give him a little pep

13  talk, everything is going to be all right.

14  Q.      How did he appear to you after the accident

15  occurred?

16  A.      Tired.

17  Q.      Did he or did he not appear to be injured in any

18  way?

19  A.      He was injured.

20  Q.      What makes you say he was injured?  What about

21  him that you saw or what makes you conclude that he was

22  injured?

23  A.      He was -- he had some blood about the head and

24  some from one of his hands.  I forget which one.

James Patrick Hannan

1    Q.    Did you have any discussion with the City of

2    Philadelphia Police after the accident?

3    A.    Yes.

4    Q.    Do you recall what was discussed with them after

5    the accident?

6    A.    The conditions regarding the accident and my

7    recollection of the same.

8    Q.    Do you recall what you told the City of

9    Philadelphia Police regarding the accident?

10   A.    Exactly, no.  Should be on the report.

11   Q.    Did you have any discussion with anybody else on

12   the pier after the accident?

13   A.    Not on the pier.

14   Q.    Did you speak to any representative from your

15   employer after the accident?

16   A.    Yes.

17   Q.    Do you recall with whom you spoke?

18   A.    Mr. Joseph Hannay.

19   Q.    Joseph -- do you know how to spell his last

20   name?

21   A.    H-A-N-N-A-Y.  He's deceased.

22   Q.    And what was Mr. Hannay's duty aboard -- what

23   was his duty with your employer at the time of the

24   accident?

James Patrick Hannan

1    A.        He was -- his exact title escapes me.

2    Q.        And you said he is subsequently deceased?

3    A.        Yes.

4    Q.        Did you speak to any other representatives from

5    your employer after the accident?

6    A.        Yes.

7    Q.        With whom?

8    A.        Mr. Richard Evans.

9    Q.        Do you have any understanding as to what his

10   title or role was with NPR, Inc.?

11   A.        Title escapes me.   He's management.

12   Q.        Management?   Do you remember the contents of the

13   conversation with Mr. Evans or Mr. Hannay?

14   A.        They were reassuring.

15   Q.        Reassuring concerning what?

16   A.        Reassuring me that everything was going to be

17   just fine.

18   Q.        Did you have any conversation with any other

19   representative of NPR, Inc. after the accident?

20   A.        Port engineer.

21   Q.        Who was that?

22   A.        Mr. Tom Rogers.

23   Q.        Was Tom Rogers employed by NPR, Inc. at the

24   time?

James Patrick Hannan

1    A.        At the time, yes.

2    Q.        And do you have any understanding or

3    recollection of what you discussed with Mr. Rogers?

4    A.        The details of the accident.

5    Q.        At whose request did you undergo drug or alcohol

6    testing after the accident occurred?

7    A.        Mr. Richard Evans.

8    Q.        Do you recall who performed the testing and

9    where it was performed?

10   A.        As to who performed the testing, I don't know.

11   I don't remember.  That testing was performed on board

12   the ship in my stateroom.

13   Q.        What happened to your motor vehicle after the

14   accident occurred?

15   A.        It stayed right where it stopped until the

16   police had allowed me to move it.

17   Q.        And then when the police allowed you to move it,

18   where did you move your motor vehicle to?

19   A.        I moved it to the employee's parking area, which

20   is just outside of the terminal.

21   Q.        And in the normal course of events, is that what

22   you had done on prior occasions when you had taken your

23   vehicle onto the pier in preparation to board the ship?

24   A.        Correct.

James Patrick Hannan

Page 29

1    Q.        And you had the permission and ability to leave

2    your vehicle there for the entire course of your

3    employment with that ship?

4    A.        Yes, it was understood.

5    Q.        How long after the accident occurred did you

6    board the Humacao?

7    A.        The exact amount of time from the incident or

8    accident to my boarding the Humacao escapes me.  I don't

9    know.  It was considerable.

10   Q.        A considerable amount of time?

11   A.        (Indicating.)

12   Q.        What were you doing prior to boarding the

13   Humacao after the accident occurred?

14   A.        Waiting for clearance from the police.

15   Q.        To allow you to board the Humacao?

16   A.        To allow me to leave the accident scene and

17   allow me to move the vehicle off the terminal and then

18   board the vessel.

19   Q.        And once you did board the vessel, once you were

20   permitted to, do you recall what you did aboard the

21   vessel?

22   A.        I started looking over some paperwork.

23   Q.        When and why did you first come off the Humacao

24   after the accident occurred?

James Patrick Hannan

Page 30

1    A.    I first came off the Humacao shortly before

2    sailing time.

3    Q.    So that would have been shortly before -- was

4    sailing time five o'clock?

5    A.    It was after midnight.

6    Q.    Oh, it was after midnight?

7    A.    Yes.  I left prior to midnight.

8    Q.    So on February 25th, the date of the accident,

9    you left the Humacao for the first time prior to

10   midnight?

11   A.    Since boarding her, yes.

12   Q.    Since boarding her.  And why did you leave the

13   Humacao at that time?

14   A.    To return to Baltimore.

15   Q.    Now, I know that the original plan was not to

16   return to Baltimore that evening.  Please explain to me

17   an understanding of what occurred which had you leave

18   the ship to return to Baltimore.

19   A.    Well, since I had failed the breath alcohol

20   content test, it was deemed necessary for me not to sale

21   as chief engineer.

22   Q.    Did NPR, Inc. get a replacement for you for that

23   trip?

24   A.    They used one of the on board engineers.

James Patrick Hannan

Page 31

1    Q.       Prior to this accident of February 25, 2000, had

2    you ever been involved in a motor vehicle accident

3    before?

4    A.       Yes.

5    Q.       How many accidents do you recall being involved

6    in prior to this one?

7    A.       One or two minor accidents.

8    Q.       Can you tell me the dates of those accidents?

9    A.       No.

10   Q.       No, you can't tell me?

11   A.       I don't know.  I can't tell you.  I don't

12   remember.

13   Q.       Do you know if they were more or less than 10

14   years before this accident?

15   A.       Both.

16   Q.       So you know you had at least one accident within

17   10 years of this accident and one accident beyond ten

18   years of this accident?

19   A.       (Indicating.)

20   Q.       Can you please describe those accidents to your

21   recollection?

22   A.       One was --two of them were my car was hit while

23   it was parked and I was in it.

24   Q.       Yes.

James Patrick Hannan

1    A.      And there was one in which I got hit by a truck

2    in Georgia driving a rental vehicle.

3    Q.      Had you ever struck anybody before with your

4    vehicle, either a person or a car?

5    A.      Not to my knowledge.

6    Q.      Is that a yes or a no?

7    A.      Not to my knowledge.

8    Q.      Okay.  In relation to any other accidents that

9    you've had before, were you ever prosecuted for or

10   convicted of driving under the influence?

11   A.      Restate, please.

12   Q.      In relation to any automobile accidents that

13   you've had before this accident that we're discussing,

14   had you ever been prosecuted for or convicted of driving

15   under the influence of alcohol?

16   A.      No.

17   Q.      Have you ever lost your driver's license for

18   driving under the influence of alcohol?

19   A.      No.

20   Q.      Have you ever had your driver's license

21   suspended for driving under the influence of alcohol?

22   A.      No.

23   Q.      Have you ever lost your engineer's license for

24   driving under the influence of alcohol?

James Patrick Hannan

Page 33

```
 1   A.      No.

 2   Q.      Have you ever lost your engineer's license?

 3   A.      No.

 4   Q.      Have you ever been arrested for or convicted of

 5   driving under the influence of alcohol?

 6   A.      Yes.

 7   Q.      Can you tell me when that occurred?

 8   A.      I was arrested in -- what was the date of the

 9   accident?

10   Q.      The date of the accident was February 25th of

11   2000.

12   A.      It was in 2001.

13   Q.      Tell me the circumstances of that.

14                   MR. GEROLAMO:  What's the relevance

15   of that?  It's post-incident, so what's the possible

16   relevance?

17                   MR. FINE:  You can object based on

18   relevancy, but I'm asking the question.

19                   MR. GEROLAMO:  Well, I'm not going to

20   allow him to answer.

21                   MR. FINE:  Okay, I'll make a note.

22   BY MR. FINE:

23   Q.      So your attorney is directing you not to answer

24   why or how any information about having been arrested or
```

James Patrick Hannan

Page 34

1    convicted for driving under the influence after the date

2    of this accident which was February 25th of 2000, but

3    you do confirm that you were arrested for driving under

4    the influence of alcohol some time in 2000; is that

5    correct?

6    A.        Correct.

7                     MR. FINE:  I put on the record I

8    reserve the right to ask that question again concerning

9    the 2001 conviction.

10                    MR. GEROLAMO:  David, if you can give

11   me --

12                    THE WITNESS:  Not a conviction.

13                    MR. GEROLAMO:  That's the thing, it's

14   not a conviction.  And if you can describe for me even a

15   tangential marginal role, I'll let him answer the

16   question.  Give me something.  How is that possibly

17   relevant to something that happened the year before?

18                    MR. FINE:  It may or may not be.

19                    MR. GEROLAMO:  Well, give me an

20   example.  Give me anything.

21                    MR. FINE:  Some sort of pattern of

22   behavior.

23                    MR. GEROLAMO:  But he has no priors.

24   He just told you that.

James Patrick Hannan

Page 35

1               MR. FINE:  Well, I believe he said he

2      didn't have any knowledge.  He didn't give me a

3      definitive yes or no.

4      BY MR. FINE:

5      Q.      Let me ask you this question.  Have you ever

6      been convicted of or prosecuted for driving under the

7      influence before this accident that we're discussing?

8      A.      No.

9               MR. FINE:  All right.  Again, I mean,

10     it may not be relevant.  I'm going to put on the record

11     that if through the course of further discovery it

12     becomes relevant, I have the right to call him back to

13     answer that question.

14               MR. GEROLAMO:  Okay.

15     BY MR. FINE:

16     Q.      Prior to this accident on February 25th of 2000,

17     had you ever had an accident before where your vehicle

18     came into contact with a pedestrian?

19     A.      No.

20     Q.      Prior to February 25th of 2000, was your

21     employer aware of any of your prior auto accidents?

22     A.      I don't know.

23               MR. GEROLAMO:  The two incidents, one

24     where he was hit when he was parked, and hit by a truck

James Patrick Hannan

Page 36

1    in Georgia, those two?

2                       MR. FINE:  I believe he testified to

3    more than two automobile accidents prior to February

4    25th of 2000.

5                       MR. GEROLAMO:  Okay, I must have

6    missed it.

7    BY MR. FINE:

8    Q.       My question is, was your employer aware of any

9    of your prior auto accidents before February 25th of

10   2000?

11   A.       Not to my knowledge.

12   Q.       Now, going back to the actual accident of

13   February 25, 2000, did you apply your brakes prior to

14   coming into contact with Mr. Bilbow at the time of the

15   accident?

16   A.       Gently.

17   Q.       Approximately, what was the distance from

18   Mr. Bilbow when you first applied your brakes?

19   A.       He was four to six feet to my left side.

20   Q.       Why did you apply your brakes?

21   A.       I was making a right-hand turn.

22   Q.       So you applied your brakes you're saying -- did

23   you apply your brakes because you saw Mr. Bilbow or you

24   applied your brakes because you were making a right-hand

James Patrick Hannan

Page 37

1    turn?

2    A.        Because I was making a right-hand turn.

3    Q.        So the application of your brakes had nothing to

4    do with Mr. Bilbow?

5    A.        Right.

6    Q.        Mr. Bilbow, just for clarification purposes,

7    Mr. Bilbow is the individual that was involved in that

8    automobile accident with you.

9    A.        Correct.

10   Q.        If you recall, on February 25th of 2000,

11   approximately, what time did you wake up?

12   A.        6:00 or 7:00, 6:30, I would say.

13   Q.        And approximately what time do you recall

14   leaving home on February 25, 2000?

15   A.        About ten o'clock.

16   Q.        And between the time that you left home on that

17   day and the time of the accident on that day, how many

18   places did you stop?

19   A.        Probably one rest stop for a cup of coffee.

20   Q.        Did you consume any other beverage or food at

21   that rest stop?

22   A.        No.

23   Q.        Was anybody a passenger in your vehicle at the

24   time of the accident?

92c3ea99-bb26-4a27-92fb-7355742b1c32

James Patrick Hannan

Page 38

1   A.       No.

2   Q.       What was Mr. Bilbow doing when you first saw him

3   on February 25th of 2000?

4   A.       He was walking north.

5   Q.       Do you recall the weather conditions on that day

6   at the time of the accident?

7   A.       Slightly gray.

8   Q.       Slightly gray?

9   A.       Correct.

10  Q.       Was there any precipitation at the time?

11  A.       None.

12  Q.       Do you recall if the pier was wet or if there

13  had been any precipitation that had recently fallen onto

14  the pier?

15  A.       I believe there were a few isolated puddles.

16  Q.       At the time of the accident, was there any

17  obstruction to your vision or view?

18  A.       I don't understand.

19  Q.       Was there anything blocking your vision or your

20  view as you were driving immediately prior to the

21  accident?

22  A.       In the direction I was driving?

23  Q.       Correct.

24  A.       No.

James Patrick Hannan

Page 39

1    Q.      At the time of the accident, did you have any
2    restrictions set forth on your license?
3    A.      No.
4    Q.      At the time of the accident, did you have any
5    vision impairment?
6    A.      No.
7    Q.      I see you're not wearing glasses now.  Have you
8    worn glasses in the past?
9    A.      I wear contacts.
10   Q.      Can you tell me why you wear contacts?
11   A.      Mostly for reading.
12   Q.      At the time of the accident, were you wearing
13   your contacts?
14   A.      Yes.
15   Q.      Can you tell me the last time you would have
16   seen an eye doctor or an optometrist prior to the
17   accident?
18   A.      Not exactly.
19   Q.      Do you have a regular scheduled appointment with
20   an eye doctor or optometrist?
21   A.      Roughly, every six months.
22   Q.      What is the name of your eye doctor or
23   optometrist?
24   A.      Dr. Bregel.

James Patrick Hannan

1 Q.  Bredel?

2 A.  Bregel, B-R-E-G-E-L.

3 Q.  B-R-E-G-E-L.  And where is Dr. Bregel located?

4 A.  Light Street, Baltimore, Maryland.

5 Q.  Is he still practicing?

6 A.  Yes.

7 Q.  At the time of the accident or before the

8 accident, had you ever had a cataract in either eye?

9 A.  No.

10 Q.  Had you ever had any surgery performed on either

11 eye?

12 A.  No.

13 Q.  At the time of the accident, did you have any

14 hearing impairment in either ear?

15 A.  No.

16 Q.  Do you recall how many miles, approximately, you

17 had driven on February 25, 2000 before the accident

18 occurred?

19 A.  Roughly, 85 miles.

20 Q.  And is it fair to assume that at the time of the

21 accident you had a valid driver's license?

22 A.  Correct.

23 Q.  Have you ever been convicted of a felony?

24 A.  No.

James Patrick Hannan

Page 41

1    Q.       When you brought your vehicle onto the pier,

2    were you acting as an agent or an employee of any person

3    or entity and within the course and scope of your

4    employment or agency?

5                    MR. GEROLAMO:   You're asking him for

6    a legal conclusion?

7                    THE WITNESS:   I don't understand the

8    question.

9                    MR. GEROLAMO:   Neither do I.   I mean,

10   you can ask him whether he considered himself to be on

11   the job.   I don't know how he can possibly answer an

12   agency question.

13   BY MR. FINE:

14   Q.       When you and your vehicle came onto the pier,

15   what was your understanding as to why you were on the

16   pier and what your capacity was to be on the pier?

17   A.       I was en route to gainful employment.

18   Q.       Were you on any errand or mission for or

19   rendering service or benefit to anyone at the time of

20   the accident on your employer's behalf?

21   A.       Not understood.

22   Q.       At the time of the accident, were you doing

23   anything to further your employer's business?

24   A.       I don't understand that, either.

James Patrick Hannan

1          MR. GEROLAMO:  Can we go off the

2    record for a second?

3               (Discussion held off the record.)

4    BY MR. FINE:

5    Q.      Sir, was there anything that you were doing on

6    your employer's behalf at the time of the accident or

7    immediately prior thereto?

8               MR. GEROLAMO:  Objection to the form.

9    He said he wasn't employed at the time of the accident.

10   That was the very first question you asked him.

11   BY MR. FINE:

12   Q.      Was there anything you were doing on behalf of

13   NPR, Inc. at the time of the accident or immediately

14   prior thereto?

15   A.      Not to my knowledge.

16   Q.      Were any citations issued to you as a result of

17   this automobile accident?

18   A.      No.

19   Q.      How long did you remain on the scene of the

20   accident after the accident occurred?

21   A.      Roughly, an hour.

22   Q.      If you remained on the scene for about an hour

23   after the accident, why was it that you didn't go onto

24   the ship for, approximately, four hours after the

92c3ea99-bb26-4a27-92fb-7355742b1c32

James Patrick Hannan

Page 43

```
 1  accident?

 2  A.       Four hours after the accident I was issued a

 3  breathalyzer test.

 4  Q.       Okay.

 5  A.       I had been on the ship for some time reviewing

 6  documents and paperwork.

 7  Q.       Is it fair to say that about an hour after the

 8  accident is when you boarded the Humacao?

 9  A.       Whenever the police allowed me to move my

10  vehicle and to leave the accident scene.

11  Q.       Are you aware of any names of witnesses to this

12  accident?

13  A.       No.

14  Q.       Did you tell anybody at the scene of the

15  accident after the accident occurred why the accident

16  had occurred?

17  A.       I don't know why the accident occurred.

18  Q.       You still don't know why the accident occurred?

19  A.       I don't know why the accident occurred.  I can

20  only give an educated guess.

21                  MR. GEROLAMO:  No, no guessing.

22  BY MR. FINE:

23  Q.       I don't want you to guess.

24  A.       I assumed or I felt that Mr. Bilbow ran into my
```